IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---oOo---

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                        No. CR. S-11-511

ANDREW B. KATAKIS, DONALD
L. PARKER, W. THEODORE
LONGLEY,

      Defendants.

_____/

---oOo---

<u>REPORTER'S TRANSCRIPT</u>

JURY TRIAL - VOLUME 18

MARCH 5-7, 2014

MARCH 10-11, 2014

---oOo---

Reported by:      KIMBERLY M. BENNETT, CSR #8953

RPR, CRR, RMR

APPEARANCES


For the Plaintiff:

      United States Department Of Justice
      Antitrust Division
      450 Golden Gate Ave., Room 10-0101
      San Francisco, California  94102-3474
      BY:  Anna Tryon Pletcher
           May Lee Heye
           Kelsey C. Linnett
           Tai S. Milder
           Trial Attorneys


For the Defendant Andrew B. Katakis:

      Higgs, Fletcher & Mack, LLP
      401 West A Street
      Suite 2600
      San Diego, California  92101
      BY:  Paul Joseph Pfingst
           Attorney at Law


For the Defendant Donald M. Parker:

      Law Offices of Scott L. Tedmon
      980 Ninth Street
      Sacramento, California  95814
      BY:  Scott L. Tedmon
           Attorney at Law


For the Defendant W. Theodore Longley:

      Office of the Federal Defender
      801 I Street
      Sacramento, California  95814
      BY:  Matthew C. Bockman
           Matthew McCrary Scoble
           Assistant Federal Defenders

1                    SACRAMENTO, CALIFORNIA

2              WEDNESDAY, MARCH 5, 2014, 9:02 a.m.

3                          ---oOo---

4          THE COURT:  Good morning, again, ladies and gentlemen.

5          All of the remaining jurors are present.  Defendants

6     are present with counsel.

7          Ms. Pletcher, are you ready to proceed with the

8     rebuttal argument on behalf of the government?

9          MS. PLETCHER:  I am, Your Honor.

10         THE COURT:  You may proceed.

11         MS. PLETCHER:  Thank you.

12              REBUTTAL ARGUMENT BY MS. PLETCHER

13         MS. PLETCHER:  Good morning, everyone.

14         You have heard over six hours of argument from defense

15    counsel.  So, right off the bat, I'd like to start off

16    reminding you of a jury instruction.  This is Instruction

17    Number 5, that arguments and statements by lawyers are not

18    evidence.  Questions and objections by lawyers are not

19    evidence.

20         You've heard a lot of things that are not evidence.

21    You've heard about day traders, car mechanics, the Broncos

22    and the Seahawks, the Chargers and the Raiders.

23         You have also heard a lot of accusations about the

24    government.  You've heard that we've ignored inconvenient

25    facts, cherry picked, wore blinders, got duped by our own

1    witnesses.

2         It's not a surprise.  There is an old saying, if you

3    don't have the facts, argue the law.  If you don't have the

4    law, argue the facts.  If you don't have either, attack your

5    opponent.

6         After all of that, all of the arguments that you have

7    heard, I want to point out one thing that Mr. Pfingst said on

8    Monday, because he got it right on when he said what this

9    case is about.  He said, This case is about the free market.

10   And that's absolutely right.

11        THE COURT:  Are you using a microphone?

12        MS. PLETCHER:  Can you hear me?

13        THE COURT:  I can hear you, but I'm not sure it's

14   being picked up.

15        MS. PLETCHER:  Can everyone hear me?

16        THE COURT:  I can hear you, but I'm not sure it's

17   being picked up by the microphone.  Tap the microphone.  Face

18   it more toward you, because I don't think it's --

19        MS. PLETCHER:  I'm going to put it right up close

20   here.

21        Sound better?

22        THE COURT:  Yes.

23        MS. PLETCHER:  Oh, there we go.  I can hear it now

24   too.  Excellent.  Okay.

25        So, this case is about the free market.  My colleagues

1    and I represent the United States Department of Justice

2    Antitrust Division, and it's our job to make sure that the

3    markets are free; that there is competition.  It's our job to

4    protect the market, to protect competition, to protect free

5    enterprise.  Competition is what makes our markets work.

6    Competition is what makes sure that people get the best value

7    for their hard-earned dollar.  Competition allows for

8    innovation and opportunity.  Competition benefits society as

9    a whole.

10    Bid rigging.  Bid rigging is not some form of

11    innovation.  It's not the free market at work.  In fact, bid

12    rigging is a crime that's been around a very long time.  The

13    Sherman Act has been on the books for over 120 years.  And

14    that's because bid rigging eliminates competition, and the

15    Sherman Act is on the books to protect competition.

16    Now, an auction, an auction is one of the most pure

17    and clear forms of competition out there.  It's out in the

18    open, you have bidders saying what they believe the price is,

19    what they are willing to pay.  You have -- when you finally

20    reach a fair price, you know that price is competitive.  That

21    fair, competitive price rewards both the seller and bidder

22    alike.  That is what competition is.  That is the free

23    market.  When the group rigged bids, they destroyed

24    competition, they trampled on the free market, and that is

25    why we're here.  That is what this case is about.

1      There has been a lot of talk about the burden of

2   proof, and rightfully so.  Let me be clear:  The defendants

3   have no burden of proof.  None.  The burden of proof is on

4   the government, and it is a burden that we proudly bear.

5   But, when defense counsel offers you arguments, you have to

6   test them.  Test them to see if they hold water.  That's what

7   we're going to do in a moment.

8      Before we go there, I'd like to show you jury

9   Instruction Number 1:

10      It is your duty to find the facts from all the

11   evidence in this case.

12      This instruction is important.  The facts of the case

13   are like a puzzle.  Like all the pieces in the puzzle box,

14   they're all mixed up as they come in during the trial.  Each

15   individual piece taken in isolation may mean nothing.  It's

16   when you put all those facts together, and you see the

17   picture that the puzzle makes, it all comes together in a

18   complete picture.

19      Now, those facts include both direct and

20   circumstantial evidence.  The instruction is you give equal

21   weight to both.  And that's important.  It's especially

22   important in a case like this, where we're showing how

23   someone knowingly participate in a conspiracy, or knowingly

24   deleted e-mails.  You can't look into someone's mind, but you

25   can see what they did, you can look at their actions.  And

1    from what they did, from what their actions are, you can

2    infer what they were thinking.

3        Defense counsel repeatedly took individual parts of

4    this puzzle, they argued those pieces don't matter.  For

5    example, yesterday Mr. Scoble said that letting a bidder fill

6    out the wrong name on paperwork was no big deal.  And it's

7    not, unless you're trying to cover up a conspiracy, unless

8    you're trying to cover up bid rigging or fraud, then it

9    matters.  But you don't know that until you see the whole

10   picture.

11       What the defendants have been doing, what defense

12   counsel has been doing, is breaking those puzzle pieces

13   apart, shaking them up in the box and saying, look, there is

14   no picture here.  That's what Ms. Heye meant when she said

15   there would be distraction and there will be confusion.

16   That's what happens when you shake up the box.  But all the

17   pieces do fit together.  The defendants, they just don't like

18   the picture.

19       It's all there.  The evidence is there for you.  It's

20   in Tony Ghio's notebook.  It's in Richard Northcutt's notes.

21   It's in Richard Northcutt's ledger.  It's in Don Parker's

22   chop notebook.  It's in the chop checks, and the invoices,

23   and the star Bs, and the e-mails.  It's there.  And they come

24   together and make a complete picture.

25       I'm going to spend a few minutes now -- more than a

1       few minutes -- talking about some of the arguments that

2       you've heard over the last day plus.

3              First I'm going to cover some topics that were raised

4       by all the defendants generally, and then I'll discuss

5       arguments raised by individual counsel for each defendant.

6              Now, it wasn't just the government that was the target

7       of some of the mudslinging that you heard, it was the

8       government's witnesses.  You heard from several witnesses

9       over the course of the trial who were involved in the scheme;

10      Ashish Patel, Tony Ghio, Richard Northcutt, Wiley Chandler,

11      Ken Swanger.  These witnesses testified because they were

12      there.  They were right there.  They saw what happened.  They

13      knew who was at the round-robins.  They knew who took money

14      and who didn't take money.  They knew because they were there

15      and they did it.  They did it too.  They knew what that money

16      was for.

17             Now, I'm not going to stand here and tell you that

18      these people aren't criminals, because they are.  They are.

19      They rigged bids.  They defrauded banks.  Some of them

20      pleaded guilty.  But, you know, the government didn't choose

21      those people.  We didn't choose who signed on for Wiley's

22      program.  We didn't choose who Andrew Katakis made payoffs

23      to.  We didn't choose who Ted Longley demanded a thousand

24      dollars a day from.  No.

25             Mr. Longley's lawyer said that no one would put their

1    life in Wiley Chandler's hands.  Remember that?  He talked

2    about the car mechanic, you wouldn't hand your keys to Wiley

3    Chandler.  The government didn't put the keys in Wiley

4    Chandler's hands.  Mr. Katakis, Mr. Parker, Mr. Longley, they

5    put the keys in Wiley Chandler's hands.  These are the people

6    they chose to work with.  The defendants chose to be part of

7    the group, and now they're trying to run away from it.  They

8    can't.

9         You've seen the documents.  It's all in the documents.

10   Tony Ghio's bid sheets.  Rick Northcutt's ledger.  Don

11   Parker's chop notebook.  The star B invoices.  These

12   documents were made before anyone knew about the federal

13   investigation.  These documents were made during the

14   conspiracy while it was happening.  These documents have had

15   no meetings with the government, they have no deals with the

16   government, they have no prior convictions, no criminal

17   record.  Test them.  Test them against what Tony Ghio said.

18   Test them against what Rick Northcutt said, and what Wiley

19   Chandler said, and what Swanger said.  It's clear what really

20   happened.  It's all there in black and white.

21        Defense counsel tried to suggest that witnesses --

22   that the government witnesses have lied to get better

23   agreements under -- to get a better deal under their

24   agreements with the government.

25        Mr. Pfingst, on cross-examination, asked Tony Ghio

1    whether he was hoping his testimony would keep him out of

2    jail.  And Tony Ghio responded he hoped his cooperation

3    showed that he accepted responsibility for what he did, that

4    he told the truth, that he wasn't trying to hide behind

5    anything, that he had two children and he wanted to be able

6    to tell them that when he screwed up he accepted

7    responsibility.

8         Defense counsel talked at length about Ashish Patel,

9    and how he worked with the FBI, as if that was a dirty word

10   or a dirty thing to do.  Mr. Patel explained what happened

11   with that FBI investigation.  Reality set in for him and his

12   cousin after he learned that there was an investigation in

13   San Joaquin County, so they agreed to help.  They agreed to

14   help in other counties.

15        To be clear, the Patels supplied -- did supply the

16   money for two FBI undercover purchases.  Ashish Patel, he

17   took the risk, he put up the money to help the government

18   uncover more bid rigging schemes.  He testified about that.

19   He did forget about all the FBI forms he had signed.  But, he

20   explained he had never actually worn a wire or recorded cell

21   phone calls.  The FBI asked him to sign the authorization

22   forms for those things, and he did, but there is nothing

23   wrong with that.  Nothing wrong with taking responsibility

24   for what you did and helping a federal investigation.

25        All these witnesses took responsibility for their

1    actions; Tony Ghio, Rick Northcutt, Wiley Chandler, Ken

2    Swanger.  Defense counsel kept saying they're just lying,

3    they're lying to please the government.  Well, the government

4    doesn't sentence anyone, the Court will, His Honor will.

5    These witnesses took responsibility.  They came here, they

6    testified under oath, under penalty of perjury, before the

7    very judge who will sentence them.  You judge their

8    credibility, whether they would lie.

9         The next thing I'd like to talk about is this concept

10   of winning a bid by a penny over, and what that means.

11   Mr. Scoble had a fancy graphic, big shiny penny.  Remember

12   that?  The defense counsel tried to make the government look

13   unreasonable by bringing up the fact that bid rigged houses

14   sold for a penny over.  Let me explain what the significance

15   is of that.

16        If you look at all the houses sold at foreclosure

17   auctions, that sold for a penny over, it doesn't tell you

18   that the house was rigged, and no one has said that it does.

19        But, if you look at the 254 properties that have

20   documents in evidence showing that they were rigged, if you

21   look at what happened at the public auctions for those

22   properties, that's when the penny over means something,

23   because it shows that, for those houses, the group was able

24   to eliminate all competition.  Not just stifled, reduced

25   competition, a penny over means they were able to eliminate

all competition. Those weren't just junk houses that would

have gone back to the bank, that nobody else wanted, because

they were bid on at the rounds. At the rounds there were

plenty of people who were interested in these properties.

You saw it in the documents. Again, go to the documents.

Let's look at this example on Tony Ghio's bid sheets.

Fairway Glenn, September 14th. Wiley Chandler took down this

house at the public auction for a penny over, and no one bid

against him. At the round-robin, there were five bidders and

the property went for $11,500 over the opening bid. How many

properties went for a penny over at the round-robin?

The only reason these properties, these rigged

properties, sold at the public auction for such a cheap

price, such an unfairly cheap price, is because the group

agreed not to bid against each other. That is why this

concept of a penny over is so important.

Defense counsel has also argued that there were too

many bidders at the steps, there is no way that everyone --

they could get everyone in the group, there was competition.

Well, you heard from Tony Ghio, from Rick Northcutt, from

Wiley Chandler and Ken Swanger just how successful the group

was at getting properties and taking them into the rounds.

What did they do with the other bidders? Well, they were

intimidated, they were bid up, or they were just plain

outmatched. The group was there every day. You heard from

1    Ashish Patel, how Wiley said he let him have the first one,

2    he always let's new guys have the first one, but not the

3    second house, or the third, or the fourth.  The group

4    recruited the repeat players.

5         Andrew Katakis had $6 million to spend.  You heard

6    from Don Parker, he was there every day with a million dollar

7    check in his pocket.  Those are the big players.  With Ted

8    Longley on the payroll, the group had an advantage over

9    everyone else, an unfair advantage.

10        But, it doesn't matter how successful the group was in

11   eliminating competition, you've heard they were, but,

12   according to the law, it doesn't matter.  Here is Jury

13   Instruction Number 15:

14        It is not a defense that the conspirators actually

15   competed with each other in some manner or that they did not

16   conspire to eliminate all competition.

17        Not all houses went to the rounds.  Not all members of

18   the group were in on every property.  But the umbrella, as

19   Tony Ghio described it, was in place all the time.  The

20   umbrella was there for the auctions to be controlled, there

21   was money changing hands.  There are documents -- again, go

22   to the documents -- showing 254 deals.  Some of them were

23   rounds, some of them were straight payoffs as you heard

24   about, but they were all payments in exchange for not bidding

25   on all of those properties.

1          The deal worked.  It worked when there were just a

2     handful of regulars at the steps, it worked when Don Parker

3     showed up, and it kept working.  It kept working when more

4     and more bidders showed up.  By the time August 2009 rolled

5     around, the agreement, the conspiracy, was firmly, firmly

6     entrenched and successful, and it didn't stop until a federal

7     investigation shut it down.

8          All right.  Let's talk about contract flipping.  I'm

9     not going to avoid the topic, I want to talk about it.  I

10    think we need to talk about it.

11         Defense counsel has raised this concept so many times.

12    And the government is not saying there is no such thing as

13    contract flipping, there is no such thing as selling your

14    right to a contract.  But, what happened at the steps, what

15    happened at the round-robins, that is not contract flipping.

16    If you buy something legitimately, you have the right to sell

17    it, of course.  It's a fundamental concept.

18         Let's look closely at Jury Instruction 16.  This is a

19    part the defense lawyers did not talk about:

20         It violates the Sherman Act for a winning bidder to

21    sell his right to purchase property as part of a conspiracy

22    -- as part of a conspiracy -- between two or more actual or

23    potential competitors to eliminate, reduce, or interfere with

24    competition.

25         That is the law.  And it's clear.

1          A round-robin is not contract flipping.  That's

2     because when Wiley Chandler or Don Parker took down a

3     property -- they didn't even call it buying a property, they

4     called it taking down -- when they took down a property for

5     the group, it was part of an agreement not to bid.  No one

6     person in the group had a contract to sell.  The group had

7     agreed to take down that property.

8          When you understand that, everything makes sense.

9     That's why all the losing bidders get paid.  Bidders all

10    expected to get their chop of the pot.  There is no one

11    seller.  There is no one seller.  Think about it, no one had

12    completed a purchase.  Wiley Chandler, when he took down a

13    property for a group, did he complete a purchase?  There were

14    no forms filled out, no buyer's name, no vesting, no one had

15    even paid for the house.  How can you have something to sell

16    when you haven't even paid for it yourself?  Ted Longley

17    never collected funds after Wiley Chandler, or anyone, took a

18    property down for the group, because they weren't buying it,

19    they were taking it down.

20         At some point the paperwork did get filled out, and

21    Ted Longley was standing by, he was making sure that the

22    right member of the group got the trustee's deed, got to take

23    title, but only after the payoffs were all negotiated.  And

24    Ted Longley wasn't going to ask any questions, because he was

25    on the payroll.

1          Now, when Don Parker flipped a house to himself, now

2     it makes sense, because he wasn't actually flipping it to

3     himself, he was buying a rigged property for the group,

4     taking down a rigged property for the group, and then paying

5     all the losing bidders.  That's clear from the evidence, and

6     nothing else makes sense.

7          Think about Ebay.  Right?  You set a minimum price.

8     Minimum price, that's the lowest amount of money that you're

9     willing to take for whatever it is that you're selling.  If

10    that minimum price isn't met, you take the item back.  Right?

11    That's how it works.  You don't have to pay all the other

12    bidders, the ones who bid but didn't make the price you asked

13    for, you don't pay them.  No.  Don Parker did, he paid over

14    $12,000 to the losing bidders on that house on Travertine

15    that you've heard so much talk about, the house he flipped to

16    himself, if you want to call it that.  And he did that

17    because that's how the round-robins worked.  It's not

18    contract flipping.

19         And, besides, if the round-robins were real contract

20    flipping, the high bidder at the public auction should get

21    all of the chop for himself, right?  When you sell that --

22    when you sell that special baseball card on Ebay, you sell

23    it, you keep all the money for yourself.  You keep it.  You

24    don't go out and distribute it to all the other people who

25    bid on your baseball card but didn't win.  That doesn't make

1    sense.

2         Round-robins are not contract flips.  The law says so.

3    You cannot flip a contract that was acquired illegally.

4         At this point I'm going to shift and focus on

5    arguments counsel raised for individual defendants.  I'm

6    going to start with Don Parker.

7         Don Parker's attorney talked a lot about the witnesses

8    in this case, especially the witnesses who are in the group.

9    Those are the people who Don Parker chose to work with.  The

10   government didn't choose them, Don Parker did.

11        Mr. Tedmon said that Wiley Chandler, he wasn't the

12   kind of guy you would rely on in your normal life, that he is

13   a convicted felon, that he had no integrity.  Well, who did

14   Don Parker choose to rely on?  Wiley Chandler.  Who did Don

15   Parker decide to stop fighting with at the auctions?  Wiley

16   Chandler.  Whose program did Don Parker sign on to?  Wiley

17   Chandler.  That's who he chose to be with.

18        Don Parker's attorney accused the government of

19   pulling some sort of card trick when Mr. Parker was

20   testifying.

21        Mr. Parker testified, he said April 29, 2009 was his

22   first day at the auctions.  The very first defense exhibit

23   for Mr. Parker was a receipt of funds from April 29th.  And

24   Mr. Parker stated, very clearly and unequivocally,

25   April 29th, he bid competitively right from the start, right

1    from that very day. By my count, April 29th came up at least

2    seven times on his direct examination. Now, he testified

3    that the round-robins started a little later, that they

4    started in May.

5         Well, that was Mr. Parker's story until he was shown

6    payoff checks from Tony Ghio, Greg Jackson, $16,500 in payoff

7    checks the first week, starting April 28th. And that didn't

8    fit with Mr. Parker's story about paying Wiley Chandler for

9    information. Couldn't explain it. But, it's simple: He was

10   taking payoffs from the very beginning. The very, very

11   beginning.

12        There is no card trick here. There is no slight of

13   hand. The government just showed him the checks, the same

14   checks that he signed, that he deposited. Don Parker's

15   testimony didn't match up with the documents. Go to the

16   documents. That's the rock to hang on to. Go to the

17   documents. Don Parker wasn't telling the truth about taking

18   payoffs. He got caught.

19        Mr. Tedmon said that Don Parker didn't bid against

20   Wiley Chandler at the public auctions because he didn't have

21   the information. Don Parker had plenty of resources to get

22   information on his own, and he did. He did. He brought a

23   million dollar check to the auctions every day. El Dorado

24   and EMS, the companies he worked for, they had real estate

25   agents, they had drivers, they did research, they calculated

bid-to numbers.  Don Parker said as little as ten to fifteen

minutes, they could have their research done.  Don Parker

admitted he could have hired more drivers.  He was making so

much money, he could afford it.

Look at Torri Yamada.  Don Parker said she was a rock

star.  He said she was a -- she said she was up at

5:00 o'clock in the morning, driving houses, working hard.

She got her own information.  She didn't pay Wiley Chandler,

or anyone else, for their information, she got her own.  And

she didn't take their dirty money either.

Think about this, if information is so valuable, if

information is king, if you cannot buy a property at the

auction without that information, why would you ask to get it

from Wiley Chandler of all people?  Why rely on your

competitors?  Your competitors who can bluff and cheat you,

and who have every incentive to bluff and cheat you.  It

makes no sense that Don Parker would trust Wiley Chandler,

the guy who answers his shoe, to give him information to make

such a big purchase, to put that much money on the line.  It

does not make sense.

Let's just say that Wiley Chandler did have

information, that he had good information, that there was

something valuable to it.  Let's just say.  Even if there

was, as soon as Wiley Chandler started bidding on a property,

that would have been a signal to Don Parker, and everyone

1   else who trusted Wiley's instinct, who trusted that he knew

2   what a good property was, to jump in.  If Wiley is bidding on

3   it, it must be good.  Then jump in, bid against him at the

4   public auction.  Bid against him fairly.  Bid against him

5   competitively.  Don't stand back and wait for Wiley to get

6   the property and then say, oh, I didn't have the information.

7   No.  You knew, when he was bidding, all you needed to know.

8   Jump in and play fair.

9           Don Parker admitted that when he got paid for houses

10  at the round-robin, he wasn't getting paid for information,

11  he was getting paid to lose.  Don Parker admitted he paid all

12  those guys in his chop notebook.  He admitted taking money

13  from them, too.  Tony Ghio, Wiley Chandler, Ashish Patel,

14  they told you that money was payments not to bid.  Even Don

15  Parker said what the chop money was for, before he corrected

16  himself.  Remember that?

17          Don Parker jumped on the Wiley bandwagon.  And the

18  rules were no different for Don Parker than they were for

19  anyone else in the group.  He was getting paid not to bid.

20  No one testified that Don Parker got paid for information, or

21  that they were paying him for information, except for Don

22  Parker.

23          Mr. Tedmon said that Don Parker didn't attend every

24  round-robin, he wasn't greedy, because he could have gotten

25  more chop checks, as if he should be commended for his

1   restraint.  Well, when you catch a kid with their hand in the

2   cookie jar and they say, but, mom, I only got half a cookie,

3   I wasn't going to take the whole cookie, do you let them off

4   the hook?  No.  They stole the cookie.  Just because Don

5   Parker could have gotten more and didn't, that doesn't mean,

6   it does not mean, that he didn't do it.

7       I'd like to talk briefly about Torri Yamada.  I'm not

8   going to rehash the whole story with Torri Yamada and Don

9   Parker, and who said what about the money.  You've heard her

10  version is different than Don Parker's version.  Their

11  stories are different.  But I will say this, Mr. Tedmon was

12  wrong when he called Torri Yamada a cooperator.  She's not a

13  cooperator.  No one said she was part of this conspiracy.

14  She wasn't charged with any crime.  She has no plea agreement

15  with the government.  But, you saw her on the stand, she did

16  not want to be here.  She had no incentive to lie.  Ask

17  yourself, though, what Don Parker's incentives were.

18      Don Parker called three character witnesses.

19  Mr. Tedmon accused the government of attacking them.  The

20  government didn't attack them, those witnesses just weren't

21  at the auctions.  They don't know what Don Parker is like --

22  was like when he was at the steps.  They just don't know.

23  They weren't there.  They don't know about Torri Yamada and

24  the wad of cash.  They don't know about the new sheriff.

25  They don't know any of that.  They don't know that Don Parker

1  agreed to take $16,500 from his competitors the very first

2  week he was at the steps.  They just don't know.  But,

3  committing a crime, it's not about who you are, it's not

4  about volunteering at a school, it's about what you did.

5  It's about what Don Parker did at the steps, and what he did

6  there was illegal.

7       Let's shift topics here.  We're going to talk about

8  Ted Longley.

9       Mr. Scoble stood up here yesterday and accused the

10  government of cherry picking.  He said he was not going to do

11  that, then he went on to do just that, starting with the very

12  first topic; the tape, the tape recording.

13       He said the tape began with Ted Longley explaining how

14  hard he worked for the money, and what an innocent seeming

15  statement that sounded, at least he tried to make it sound

16  that way.  But, that's not how the tape started.  It's not.

17  I'm going to play a short clip of how the tape actually

18  started.

19       (Audio played.)

20       That's when he says works hard for the money.  You

21  heard how much happened before we even got to that point

22  where Mr. Scoble wanted to start talking about what happened

23  on the tape.  Ted Longley takes an envelope, the nice and

24  fat, with $2,000 in it.  That's what he's talking about.

25  That's what he's laughing about at the beginning.  Then Wiley

1    Chandler says that he couldn't get -- he couldn't get

2    anything, he missed it.  Well, that's because -- you heard

3    why, that's because Ted Longley stopped doing them favors.

4    That was why the whole conversation was happening in the

5    first place.

6         Then you hear Ted Longley talking about how he needs

7    some consistency, how he's tired of all these table scraps.

8    And we played the whole tape for you.  You heard the whole

9    tape during the trial.  You heard both conversations, the

10   whole thing.  So, you could hear the whole thing in its

11   context, and it's important.

12        Remember that big puzzle piece?  You've got to see the

13   whole thing together, not just individual little pieces of

14   the puzzle.  And when you hear this whole thing together, you

15   can hear that Ted Longley knows exactly what the group is

16   doing.

17        Well, I shouldn't say the word "exactly."  He doesn't

18   need to know exactly what they're doing.  He knows -- he

19   knows that they are trying to suppress competition.  He knows

20   they're trying to reduce competition at the auctions.  Listen

21   to his words.  It's not about Wiley Chandler buying

22   properties for himself, it's about what he's doing with the

23   other bidders.  There are code words.  Do a deal.  Do a deal.

24   Get a piece of it.  If something goes down.  Pay attention to

25   those words.  You'll see that's Ted Longley, he wants his

1    cut.

2          And he gets paid more when there are more deals.  This

3    is an important concept:  Ted Longley only gets paid when

4    something happens, as he calls it, when something happens,

5    and he's working hard for that money.  It means he's making

6    hard -- working hard to make sure that something happens for

7    the group, because when something happens for the group, Ted

8    Longley gets paid more.

9          Let's listen to this next piece.  This is the only

10   other piece we're going to listen to.

11         (Audio played.)

12         That's fair to Ted Longley; when the group doesn't get

13   anything, he doesn't get anything, when they get something,

14   he gets something.  That's his incentive to help the group.

15   Their fortunes are tied together.  He just tied them together

16   right there.  When the group succeeds, Ted Longley succeeds.

17         Now, this tape was made at the end of 2008.  So,

18   everything that Ted Longley did for the group, a lot of the

19   favors that you heard about, they developed from this point.

20   Things were happening beforehand, but it was no coincidence

21   that once Ted Longley started making these thousand dollars a

22   day, once he tied his fortune to the fortune of the group,

23   things started happening.  It was not a coincidence.  There

24   were no equal favors for all.  Ted Longley was actively

25   helping the group because he had an incentive, an incentive

1    to reduce competition in favor of the group.  The more deals

2    they do, the more he gets paid.

3           There is something else to think about when you ask

4    yourself did Ted Longley know that the group was trying to

5    reduce competition, that they had a conspiracy:  Ted Longley

6    never would have approached honest bidders to demand a

7    thousand dollars a day.  Do you think he would have

8    approached Torri Yamada with a proposition like this?  Honest

9    bidders, they wouldn't go for anything like that.  Ted

10   Longley knew that Wiley Chandler, Rick Northcutt would give

11   him the money, because he knew they needed him for their

12   scheme.  He was counting on it.

13          So, that's the point, the more deals the group does,

14   the more Ted Longley gets paid.  He was not a neutral

15   referee, treating everyone the same.  He was taking sides.

16   He was on one of those teams with the group.

17          Remember Mr. Pfingst's analogy about the Chargers and

18   the Raiders rooting for their team, and when there is a tough

19   call, is it an incomplete pass, or was it a fumble, and

20   everyone is reviewing it on the tape?  Well, if the referee

21   is Ted Longley, you know which way that call is going, it's

22   going in the favor of the people who are putting the thousand

23   dollars a day in his pocket.  There is nothing fair about

24   that.  Nothing fair about that.

25          Tips.  Mr. Scoble said Ken Swanger said that tips were

1    common.  Remember that?  Well, it's just like the tape

2    transcript, he left out some important things.

3            On redirect, I asked Ken Swanger if it was common, if

4    it was normal, to pay auctioneers a thousand dollars a day,

5    to pay them the way the group was paying Ted Longley.  And

6    his answer was, no, not at all.  Ken Swanger also said that

7    when he signed the receipt of funds, he told Ted Longley that

8    he won the house at the secondary auction.  That's what Ken

9    Swanger called the round-robin, secondary auction.  He told

10   him that.  But you didn't hear that from Mr. Scoble.

11           The paperwork.  Let's talk about that for a minute.

12           Defense counsel wants to nitpick each individual piece

13   of paperwork, pluck each of those little pieces out of the

14   puzzle, shake up the box; it's not against the law to fill

15   out paperwork this way or that way.  And that's true, but

16   that's not the point.  No one can dispute that these are

17   supposed to be open, competitive, free and fair auctions.

18   That's what an auction is all about.  Ted Longley knowingly,

19   intentionally submitted paperwork that made it look like

20   these were free, fair, competitive auctions, even though they

21   were not, even though they were rigged.  You can look at one

22   inaccurate line in isolation, one little piece of that

23   puzzle, and say it doesn't matter, but hundreds of forms for

24   rigged properties?

25           Remember, you need to view the evidence as a whole,

1    view the whole puzzle together, the whole picture that comes

2    together.  Viewed as a whole, you can see that this paperwork

3    was part of the scheme.  It was false and misleading on

4    purpose to make sure that no red flags were raised.

5        If you want to look at one kind of paperwork that

6    really hammers this point home, it's those bid logs.  He

7    fabricated big logs; fabricated out of whole cloth.

8        Ms. Heye showed you some of those in her closing

9    argument.  Why would Ted Longley do that?  Why would he

10    completely make up a document, saying what happened at the

11    public auctions and have it be not true?  If the group wanted

12    to just switch the vesting, they could have done that.  They

13    could have done that on the receipt of funds.  You know why

14    Ted Longley did that, he wanted to help the group.  He wanted

15    to help them get those properties.  He wanted to help them

16    get those properties illegally.  And he did.

17        Ted Longley did a lot of favors.  You heard a lot of

18    different favors that he did, including the paperwork.

19    Counsel argues that he did favors for everybody, anyone could

20    have veto power over how the -- over the order in which he

21    calls properties, he was doing this for everybody.  Well,

22    that's just not true.  Remember the blue light special?

23    Let's use that as an example.

24        As Rick Northcutt explained, the blue light special

25    was when Ted Longley would auction a property before he had

1    clearance from the trustee.  But "auction" isn't the right

2    word.  He would give the group the option to buy it before

3    anyone else knew about it, before anybody else had the

4    opportunity.  And if he got clearance, the property was sold,

5    it was sold to the group, no one else even had a chance.

6    That is stifling competition in the worst way.  If clearance

7    never came, Ted Longley would just void the sale.  All

8    upside, no downside, but only if you're in the group.

9         The group was willing to pay for these favors because

10   they knew how valuable they were.  Rick Northcutt, Wiley

11   Chandler, Tony Ghio, Andrew Katakis, they all contributed to

12   Ted Longley's salary.  And why were they willing to pay for

13   it?  Because they were so valuable.  He helped keep prices

14   low, helped keep competition down, let them get properties at

15   the cheapest, unfair price.

16        Mr. Scoble, he made a lot of excuses for Ted Longley,

17   but one thing really stuck out to me, and I wrote it down

18   because it just didn't sound right.  I heard Mr. Scoble say

19   that Ted Longley would cry a property like this, he said:

20        Do I have a hundred thousand dollars and a penny?

21   From somewhere around the crowd somebody says a hundred

22   thousand, one penny.  And he says, okay, I have a hundred

23   thousand and a penny.  Once, twice, third, final, sold.  He

24   had no idea, no idea who bid on that property.  And there is

25   no reason he would.  He doesn't care.  That's not what he's

1    trying to do, he's not trying to get through -- he's just

2    trying to get through his list of properties.  He was so

3    busy, he had so many properties, he was just trying to get

4    through it.  Really?  The auctioneer doesn't even know who

5    bid or who wins?  That's his job.  He's supposed to know.

6         There are some things that you can't chalk up to just

7    being too busy.  When you add up what Ted Longley said in the

8    recording, how much he was being paid, the auction paperwork,

9    the bid logs, the favors he did for the group, and what he

10   saw at the auctions, day, after day, after day, what he saw

11   the group doing, the conclusion is overwhelming, Ted Longley

12   was the group's inside man.  He was, as he put it, in one

13   hundred percent.

14        Let's talk about Andrew Katakis.

15        Andrew Katakis ran two multimillion dollar companies;

16   CEMG and Lenders.  He came to San Joaquin foreclosure

17   auctions with $6 million to spend.  He was the biggest player

18   around.  Bigger than Wiley Chandler, Rick Northcutt, Tony

19   Ghio.  Even Don Parker, with his million dollars in cashier's

20   checks, he couldn't come close.  Mr. Katakis' counsel talked

21   to you about four hours, tossed out theory after theory, some

22   of those theories contradicted each other, some of them are

23   beside the point, some of them just don't -- plain don't make

24   sense.  When you clear away all that smoke and mirrors, you

25   can see what really happened.

1        Andrew Katakis had a lot of money at stake.

2    Dr. Bockus totaled up the profit that Andrew Katakis made

3    just on the properties on the Northcutt ledger.  That's in

4    Exhibit 43.  What was the total?  $1.9 million in properties

5    bought over just three months.  Rigged properties.

6    Dr. Bockus traced all the pass-through payments, funneled

7    through Swan Construction.  It's Exhibit 42.  How much did he

8    trace?  Over a million dollars between January and

9    September 2009.  Over a million dollars.

10        I want to focus on dates for a minute.

11        One of defendants' theories is that Ken Swanger's

12    first solo bid, as he called it, was for the Woodside house.

13    Woodside was purchased on July 17, 2009.  This is when Ken

14    Swanger supposedly opened the vault for CEMG and Lenders.

15    Remember that phrase?  "Opened the vault."

16        Look at this chart.  See how much pass-through

17    payments happened before July 17, 2009.  I count 13, all

18    before July 17, 2009, before Ken Swanger took over for Mark

19    Tillotson.

20        You see, this theory, like many of the others, does

21    not make sense.  Ken Swanger didn't open the vault, neither

22    did Steve Swanger, neither did Mark Tillotson.  It was Andrew

23    Katakis who opened the vault, because he wanted to stuff it

24    full of money with rigged houses.  $1.9 million from rigged

25    houses.  That's a pretty powerful motive for joining the

Wiley gang.  By making payoffs to Wiley Chandler and the others in the group, that's how he was able to make that $1.9 million, by getting those homes at unfair prices because he joined the group.

Andrew Katakis had the motive -- the motive and the opportunity.  We know he was talking to Wiley Chandler.  He'd known him for a long time.  He knew what he was doing.  Motive and opportunity to cheat the system.  And, he tried to keep his hands clean.  He let Wiley Chandler, who was already down in the mud, do his dirty work for him.  But, you know, that mud splatters.

Time and again, Mr. Katakis' lawyer mentioned the names of these three properties, North Falcon, Queensland, Magnetite.  There was a claim that these were contract flips.  And we've already talked about why round-robins are not contract flips, and I'm not going to go back there.  But what these houses show, actually, is how thoroughly the group rigged the auctions, and how Andrew Katakis was in direct contact with Wiley Chandler negotiating payoffs.  So what if Steve Swanger was on the golf course.  Remember hearing a lot of talk about the golf course?  Steve Swanger wasn't there.  Well, when the fix is in, you can phone in your orders.

You remember Mr. Katakis' lawyer asked Tony Ghio about those houses, and it turned out that Tony Ghio had these properties written down on his spreadsheet, and he read those

1    parts of the spreadsheet into the record.  That means that

2    Tony Ghio got a payoff related to those properties.  It's

3    written down.  He wrote it down and he read it to you.

4         Again, what's in the documents?  These properties were

5    purchased as part of an agreement not to bid.  Tony Ghio was

6    part of it.  The payoff that's negotiated over the phone is

7    just as illegal as one that you do in person.  You'll see

8    that there were Bs, the star B code, the B code is on the

9    invoices for these properties.  The documents.  The documents

10   don't lie.  As with all the other payoff invoices marked with

11   a code, these invoices were paid, paid by Andrew Katakis.

12        Mr. Pfingst showed you some phone records, phone

13   records that said Rick Northcutt -- Mr. Pfingst suggested

14   Rick Northcutt is a liar because his cell phone doesn't show

15   as many calls to Steve Swanger as he remembered.  Well, 2009

16   was four and a half years ago, and it's natural -- it's

17   natural that memories are faded about exactly how many phone

18   calls someone made, and exactly how many minutes they spent

19   talking to someone.  Mr. Pfingst is focusing on that kind of

20   detail, that kind of little piece of the puzzle, shaking up

21   the box, because he wants to distract you from that bigger

22   picture.

23        The bigger picture is that Andrew Katakis knew about

24   the rounds, he knew about the payoffs, and he knew because

25   Rick Northcutt and Wiley Chandler and Steve Swanger, they all

1    kept him in the loop.

2         I've talked a lot about the documents, and how

3    important the documents are, how it's all there in black and

4    white.  And there was a point yesterday when Mr. Pfingst

5    questioned the accuracy of Tony Ghio's bid sheets.  He asked

6    why the notes show that Wiley Chandler won a round-robin when

7    actually CEMG or Lenders had taken title to that property.

8    There must be something wrong with the Ghio spreadsheets.

9    You can't trust them, the Ghio bid sheets.

10        Well, Tony Ghio gave you the answer.  He explained to

11   you that what happened on -- at the round-robins is recorded

12   in his bid sheet, but only what happened at the round-robins.

13   Tony Ghio was there, he was sitting there at the table, and

14   as everybody bid, he wrote it down.  He wrote it down as it

15   happened.  But only what happened at the round-robins.

16   Afterwards, when the group broke up, Wiley Chandler could

17   have done some other deals, other things could have happened.

18   But, if it's on the bid sheet, it happened at the

19   round-robin.

20        And Tony Ghio had every incentive to make sure that

21   those bid sheets were accurate.  There was a lot of money at

22   stake.  These guys were paying each other a lot of money.

23   The chop values are huge.  They go up to $50,000.  More.

24   Just because these guys are bluffing each other, maybe

25   they're playing some poker, they're not messing around with

1  their money.  They want to make sure they get every penny of

2  it.  And those documents recording the money are important,

3  they're accurate, those are their receipts.

4      Let's look at one of the properties on this Ghio bid

5  sheet that has come up again, and again, and again.

6      Mr. Pfingst brought this up, trying to suggest that

7  Tony Ghio's notes were inaccurate.  This is Ada.  The bid

8  sheet for Ada.  Remember this one?  You've seen it several

9  times.  And this one does look striking because there is such

10  significant bidding, so many rounds, it went on for a long,

11  long, long time.

12      Mr. Pfingst pointed out, look, Ken Swanger broke out

13  really early, but the bidding kept going, and then Wiley

14  Chandler was bidding against himself.  Wiley Chandler was not

15  bidding against himself.  I asked Tony Ghio what happened in

16  this property.  I asked him when he was on the stand.  And he

17  explained.  He said, Ted Hutz and Wiley Chandler were bidding

18  against each other so fast that he couldn't keep up, so he

19  just wrote down everything that Wiley Chandler was saying.

20  And if you look over at the payoff calculation, look at that

21  number that Ted Hutz got, $47,000 in payoffs.  That's because

22  he was bidding all the way to the bitter end.

23      You remember how their formula worked, if you stay in

24  and bid longer, you get rewarded for it, you get a bigger

25  chop of the pot.  Ted Hutz got a huge chop of the pot here.

1    That K-A-T, that stands for Andrew Katakis.  Right.  So, you

2    know what happened at this round-robin.

3         Tony Ghio did also testify that after the

4    round-robins, other things could have happened.  And this

5    property did end up in Lenders Financial.  It did.  But, even

6    if Ken Swanger dropped out early, and then he ended up buying

7    it again, was he trying to cheat Andrew Katakis?  Was he

8    trying to pull the wool over his eyes?  Let's sees how much

9    Andrew Katakis made in profit on this property.

10        How much did he make?  Exhibit 798 is the profit and

11   loss statement for this property.  Under repairs and rehab,

12   you'll see the first line, what does it say?  It says Swan

13   Construction full rehab.  Now, you all know that when it says

14   full rehab, that's not really what it means.  There is no

15   $49,000 in full rehab happening the day this property is

16   purchased, within a day or two of its purchase.  No.  You

17   won't be fooled by that.  That was the chop.  That was the

18   pot that was paid.  Even with that enormous pot paid out to

19   the other guys not to bid, look how much profit, $69,000 in

20   profit Lenders Financial made on this property.  $69,000 on

21   this property, after paying out almost $50,000 in payoffs.

22   After Andrew Katakis collected all of his management fees,

23   still, $69,000.

24        You combine the payoffs and the profits, this house,

25   the house that sold for $55,000, was worth a whole lot more;

over 200,000. And it was rigged. You see the incentive, the incentive to join in with Wiley, how much you can make if you get those properties for an unfairly low price. Even if you have to pay off everyone else, huge profits. Huge.

Mr. Pfingst said that the government missed the real scam. He argued Mr. Katakis isn't the perpetrator of a crime, he's a victim. This is a tactic, and it does not hold up. There was no evidence of the Swangers or Wiley Chandler or Richard Northcutt trying to swindle Andrew Katakis. That's all made up. Let's look a little closer at this theory, and you'll see that's not what was happening.

It starts with this idea of the bid-to number. There was a big deal about Ken Swanger is giving Wiley Chandler his bid-to number, he must be trying to steal from him, he must be trying to pull the wool over his eyes. No. Mr. Pfingst started with this poker analogy. Remember the poker table graph? And he asked, why would Ken Swanger, bidder number 4, show his hand to bidder number 5? He pointed to that as evidence that Ken Swanger and Wiley Chandler, they were trying to swindle Andrew Katakis. No. Let's back up.

Ken Swanger testified sometimes he would give Andrew Katakis his bid-to -- sometimes he would give Wiley Chandler his bid-to number. And Mr. Pfingst asked him why. What did he say? He said, Well, I was told from day one to work with Wiley, to get information from him, to share information with

him.  And this is one of those places where Andrew Katakis'

defense theory -- theories contradict each other.  On one

hand, he's saying Wiley Chandler and the Swangers were trying

to cheat Andrew Katakis.  On the other hand, he's saying

Andrew Katakis and Wiley Chandler were in a joint venture,

they were sharing information.

        Yesterday, Mr. Pfingst said that Andrew Katakis had

resources, and Wiley Chandler had resources, and they were

both combining their resources, their resources were critical

to making an informed decision about what to purchase at the

auctions.  He compared it to a day trader, a day trader

trying to get together and do a buy and hold with an

investor.  He called that a legitimate joint venture.  He

read you some selections from the jury instruction about

joint ventures.  Here is what he read.  The parts in yellow

are the parts that Mr. Pfingst read.  What I'd like to do is

look at the part that he skipped.  Look at the part in the

middle:

        A joint venture or partnership is legitimate only if

it has a purpose other than the very crime charged here; the

agreement to eliminate, reduce, or interfere with competition

at the foreclosure auctions.

        That was the only purpose of Wiley Chandler's

relationship with Andrew Katakis.  The only purpose.

        The joint venture defense is irrelevant for another

KIMBERLY M. BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1   reason, and that's this jury instruction:

2          One or more members of even a legitimate joint venture

3   or partnership cannot lawfully agree to eliminate, reduce, or

4   interfere with competition with a competitor outside the

5   joint venture or partnership.

6          Tony Ghio wasn't in a joint venture with Andrew

7   Katakis.  Ashish Patel wasn't in a joint venture with Andrew

8   Katakis.  Don Parker testified he certainly was not in any

9   joint venture with Andrew Katakis or the round-robin bidders.

10  So, if Wiley Chandler and Andrew Katakis, even if they did

11  have a joint venture, it doesn't matter unless everyone else

12  was in a joint venture with them, and we know that is not

13  true.

14         You've heard evidence about Andrew Katakis conspiring

15  with others besides Wiley Chandler.  It's not just about

16  Wiley Chandler.  You heard about him taking turns, taking

17  turns, you bid against me, you don't bid against me now, I

18  won't bid against you.  Remember that e-mail about the Indian

19  guys counting as a turn?  If they get one, that counts.  He

20  knew it was more than just Wiley Chandler.

21         Do you remember his conversation with Tony Ghio?  Tony

22  Ghio said, when Andrew Katakis first came to the steps he

23  said, I have $6 million to spend, and I want to work

24  together.  So, now you've got Tony Ghio and Andrew Katakis

25  connected.

1          You heard Bob Florsheim telling Andrew Katakis -- you

2    heard Bob Florsheim say, Andrew Katakis said the regulars are

3    getting greedy, let me talk to them, when the topic of

4    partner buyouts -- so-called partner buyouts was getting too

5    high.  Bob Florsheim understood that the regulars were Wiley

6    Chandler, Rick Northcutt, Tony Ghio, and other people.  Bob

7    Florsheim knew about it.  Of course Andrew Katakis knew about

8    it.

9          But being part of a joint venture, just being part of

10   it, it doesn't insulate you, doesn't insulate Andrew Katakis

11   from what Wiley Chandler, or anyone else, was doing on his

12   behalf.  Let's look at this next slide, this next jury

13   instruction:

14          One may become a member of a conspiracy without full

15   knowledge of all the details of the unlawful scheme.

16          You don't have to know every single detail.

17          So, there was no legitimate joint venture.  There was

18   a partnership.  It was a criminal partnership.

19          Andrew Katakis can't have it both ways.  He can't say,

20   when they're sitting at the poker table, Wiley Chandler was

21   in a joint venture, but Wiley Chandler is also my competitor.

22   If Andrew Katakis and Wiley Chandler were partners, they

23   really were partners in a joint venture, as Katakis told --

24   as Andrew Katakis told Ken Swanger, then there is nothing

25   wrong with Ken Swanger giving Wiley Chandler his bid-to

1       number.  If they're partners, what's wrong with that?

2              And even if he did give him his bid-to number, Andrew

3       Katakis still got a really good deal.  He still made huge

4       profits.  That bid-to number left plenty of room for profit.

5       Plenty of room.  And, as Ken Swanger explained, Ken Swanger

6       stayed within that bid-to number.

7              And the bottom line is, even making payoffs, Andrew

8       Katakis was making a lot of money.  Payoffs, to him, were

9       just another cost of doing business.  Just another cost.  You

10      saw it in the P&Ls, just another cost.  And it's worth it to

11      him.

12             This whole argument, this idea of the bid-to number,

13      it's a distraction.  Andrew Katakis complaining that he got

14      ripped off, complaining, oh, I got ripped off during these

15      illegal round-robins, because you can't even get to the poker

16      table, remember, unless you're doing something illegal.  No

17      one is invited to that poker table unless they agree not to

18      bid.  So, once you're in it, once you're in the illegal deal,

19      once you're at the illegal card table, you can't start

20      complaining that other people are bluffing you, or trying to

21      cheat you, that others got too much take from the

22      round-robins.

23             When you think about it, always go back to motives.

24      All right.  Think about motives.  Why are people doing the

25      things they're doing?

1          Does it make sense for Ken Swanger to drive up the

2    bidding to make Andrew Katakis pay more for these properties

3    at the round-robins?  What was Ken Swanger's incentive?  His

4    incentive was tied to Andrew Katakis'.  Just like Ted

5    Longley's was tied to the group; when the group succeeds, Ted

6    Longley succeeds.  Well, when Andrew Katakis succeeds, Ken

7    Swanger succeeds.  Remember how he gets paid -- how he got

8    paid?  He got paid a percentage of the profit.  A percentage

9    of that $69,000 that you saw in Ada.  The bigger that profit

10   number, the bigger -- the more money Ken Swanger gets.  He's

11   not incentivized to cheat at the round-robins, to drive up

12   the bidding.  He's not.  His incentive is to get that

13   property for the cheapest, best price, just like Andrew

14   Katakis.  Their incentives are aligned.  He has no motive to

15   cheat Andrew Katakis.

16        There were no payoffs from Richard Northcutt and Wiley

17   Chandler to Ken Swanger.  That $600,000 that you heard so

18   much about, that is not a payoff.  There was absolutely no

19   evidence of that being a payoff.  It's a good example of,

20   "what lawyers say is not evidence."  If you say something

21   enough, it doesn't become evidence.

22        The Castleberry story is simple, it's clear.  Ken

23   Swanger had some business dealings in another county with

24   some people named the Castleberrys, but it's irrelevant.  It

25   has no bearing on what happened in San Joaquin County, no

1    bearing on what happened at the rounds, what happened at Ada,

2    and how much profit Mr. Katakis is getting, what Ken

3    Swanger's incentives are.  Not at all.

4         See, both Ken Swanger and Rick Northcutt explained

5    that that money was money that was invested with a company

6    called Nor-Cal Redevelopment Company.  Nor-Cal Redevelopment

7    Corporation.  It was in another county.  It wasn't money that

8    went into Ken Swanger's pocket, it went to the Castleberrys

9    as capital to buy properties.  That's how Ken Swanger

10   explained it and Rick Northcutt.  Rick Northcutt and Wiley

11   Chandler got that money back, they got their capital

12   investment back when the investment paid off, when it started

13   to make money.  There was no payoff.

14        Even if you believe Ken Swanger, when he gave his

15   bid-to number to Wiley Chandler, and Wiley Chandler took

16   advantage of that, that's no evidence of an agreement not to

17   bid, it's a side squabble, a side show, a little fight among

18   coconspirators.  That's what it is.

19        You know, this may be what happens when you stay

20   behind the scenes, when, in Andrew Katakis' position, you're

21   trying to keep your hands clean, you're trying not to get

22   them dirty, you let other people do your dirty work and you

23   don't go to the rounds, so you don't see these side

24   squabbles.  But, you've heard the expression, he who lies

25   down with dogs rises up with fleas.

1          Wiley Chandler --

2          MR. PFINGST:  I'm going to object, guilt by

3      association.  That, I believe, is beyond the instructions.

4          THE COURT:  Well, all of the arguments are mostly

5      beyond the instructions.  So, I'm going to overrule the

6      objection.

7          MS. PLETCHER:  Andrew Katakis used Wiley Chandler.  He

8      used a lot of people.  He used Wiley Chandler to do his dirty

9      work, to intimidate honest bidders, to keep him informed

10     about the round-robins, to pay his payoffs, to keep track of

11     credits.  And now he's complaining that Wiley Chandler, who

12     had a separate seat at the rounds, didn't make sure that

13     Andrew Katakis got the best, cheapest price at the rounds.

14         Now, Mr. Pfingst also argued that Andrew Katakis

15     disapproved of the round-robins, that he didn't want his

16     employees taking part.  Andrew Katakis knew exactly what his

17     employees were doing at the rounds.

18         Steve Swanger said that Andrew Katakis told him that

19     if they didn't take money at the steps, they would be okay.

20     And Mr. Pfingst crossed Steve Swanger extensively on this

21     point.  But Steve Swanger insisted that Andrew Katakis chose

22     his words carefully.  He said, We're okay as long as we don't

23     take money down there, as long as we aren't taking money down

24     there.  And they didn't take any money at the steps.  There

25     was no cash changing hands down there, and that's because

1    Andrew Katakis had arranged for Rick Northcutt and Wiley

2    Chandler to do it for him.  He knew exactly -- Andrew Katakis

3    knew exactly what he was doing.  He didn't disapprove of the

4    round-robins, he just didn't want to get caught.

5         Let's talk about the last count, the obstruction

6    count.

7         THE COURT:  Why don't we take a 15-minute recess now.

8         (Thereupon a recess was taken.)

9         THE COURT:  Everyone is present.

10        Ms. Pletcher, you may continue.

11        MS. PLETCHER:  Thank you.

12        When we left at the break, we were about to discuss

13   the obstruction of justice charge.  So, we'll pick up there

14   now.

15        Mr. Pfingst threw out a lot of smoke and mirrors about

16   the obstruction charge.  He called a very slick, professional

17   expert witness, Don Vilfer, to muddy the waters.

18        To start with, Don Vilfer didn't even know what CART

19   stood for.  CART was the acronym for the group that he

20   supervised.  It stands for Computer Analysis Response Team.

21   Don Vilfer admitted that he never conducted a single computer

22   forensic examination during his time at the FBI, not one.

23   And that's because he's a lawyer.  And now his job is to give

24   paid testimony for his clients.  Pretty pictures and an

25   authoritative tone of voice can be persuasive, but neither of

1    those things mean that you know how to do a computer forensic

2    examination.

3         Agent Medlin is a certified FBI cyberagent.  He is a

4    certified FBI Computer Analysis Response Team Forensic

5    Examiner.  That means that he's spent years studying computer

6    forensics.  He's spent years in the lab, not on the witness

7    stand.  So, you decide who is more qualified to talk about

8    what happened to Andrew Katakis' computers; the guy who left

9    all his test results out of his report, or the FBI agent who

10   examines computers every single day.

11        Back to the charge.  The charge is, actually, very

12   simple.  The question is:  Did Andrew Katakis knowingly, that

13   means not by accident, did he knowingly delete e-mails with

14   the intent to impede or obstruct a federal investigation.

15        Now, Mr. Pfingst said that Andrew Katakis knew about

16   the investigation way back in October 2009, so the timing in

17   September of the installation of Drivescrubber, actually,

18   that coincides with some computer problems that they were

19   having, not about the investigation.  Well, Andrew Katakis

20   didn't know the investigation was focused on him.  He tried

21   to keep his hands clean, he had others do the dirty work for

22   him, he thought that was working until he got a copy of the

23   subpoena, the bank subpoena, asking for his bank records, his

24   name, his company.  Once he got the letter from the bank, he

25   took action right away, within 48 hours, to destroy evidence.

1          Andrew Katakis deleted those e-mails when he hit the

2     delete key.  Hit the delete key.  That's it.  That's

3     obstruction of justice.  But, you have more than that.

4          Agent Medlin and Mr. Vilfer agreed that there was no

5     trace of those ten e-mails on Andrew Katakis' computer or the

6     GD mail server.  They agreed on that point.  So, then you

7     have to ask yourself, why?  Why is there no trace of these

8     e-mails?  And there are really only two possible

9     explanations:

10         One, those e-mails -- those e-mails that you saw at

11    trial, they never existed, never existed to begin with,

12    somebody made them up.

13         Or, those e-mails existed and someone deleted them.

14    Deleted and erased them.

15         Which choice does Don Vilfer suggest was the right

16    one?  Must have been fabricated.  That's what he thought.

17    Metadata and all.  Never mind that Bob Florsheim.  Bob

18    Florsheim received two of those e-mails and talked about them

19    at trial.  How could they have been fabricated?  Never mind

20    that Steve Swanger is computer illiterate; those are his

21    words.

22         Let's look at defense counsel's Exhibit five Ls.

23    Steve Swanger says he's computer illiterate.

24         Do you believe Mr. Vilfer that any high school

25    student, that Steve Swanger, would know how to export

1    e-mails, how to make up metadata using a hex editor, and then

2    import that e-mail back into Outlook and fool an FBI agent?

3    Do you believe that Steve Swanger could do that?  Do you

4    believe Don Vilfer when he said it was that easy?  No.

5    That's the theory of a professional witness, who will say

6    anything to please his client.

7         The only reasonable answer, the only answer supported

8    by the evidence, is that Andrew Katakis deleted those

9    e-mails.  Forget all the jargon, hex editors, Exchange

10   Database, those e-mails existed and they were deleted.  There

11   is no trace of them.

12        Let's go back to the timeline that you saw Ms. Heye

13   show you.

14        Andrew Katakis had the means, he had the motive, and

15   he had the intent to delete those e-mails.  This was no

16   accident.  He took calculated steps to erase that evidence.

17   When he got that bank subpoena, he deleted e-mails and

18   documents.  He purchased Drivescrubber, he downloaded it, he

19   installed it.  Did he run it?  Well, if he didn't run it, if

20   he didn't run it, there should be some remnant of the e-mails

21   somewhere on Andrew Katakis' computer.  There was none.

22   Agent Medlin searched all the active files, and all the free

23   space, and he found no trace.

24        Don Vilfer said he recovered double-deleted e-mails.

25   He said that the e-mails weren't in his report.  And we don't

1    know what they contain, you don't know what they contain,

2    because he didn't show you all these thousands of

3    double-deleted e-mails he recovered.  One thing we do know

4    though is that Mr. Vilfer couldn't find the real e-mails you

5    saw in this trial, those ten e-mails, he couldn't find them.

6         Even if we take the experts out of this and listen to

7    Lee Craddock.  Remember Lee Craddock?  He was the IT guy for

8    CEMG and Global Discoveries, Andrew Katakis' own IT director.

9    Lee Craddock told you that Drivescrubber is used to nuke and

10   scorch hard drives.  That's what he uses them for, to

11   permanently delete data.  Most importantly, he told you how

12   shocked he was to find that Drivescrubber had been installed

13   on the GD mail server, the server that Lee Craddock is tasked

14   with maintaining.  He told you how upset he was.  He told you

15   he went looking for someone who did it, and that searched

16   ended right at the door of Andrew Katakis.

17        One more thing.  Lee Craddock mentioned this issue of

18   blacklisting.  Well, that's his job.  His job is to deal with

19   antivirus software.  He's an IT director.  He doesn't want

20   all the computers on his network to get viruses.  That has

21   nothing to do with Drivescrubber.

22        Why?  Why is there no trace of these ten e-mails on

23   Andrew Katakis' computer?  Or Steve Swanger's Asus computer?

24   Or the GD mail server?  Why?  There is only one reasonable

25   answer, Andrew Katakis deleted them.

1          You saw the receipts, you saw the receipt from Iolo,

2    you saw the install logs.  Andrew Katakis purchased,

3    downloaded, installed and used Drivescrubber on multiple

4    computers.  And before that, he hit the delete button.  None

5    of this was a mistake.  None of this was an accident.  It was

6    obstruction of justice.

7          I want to go back to the burden of proof for a minute

8    here.  I mentioned it at the beginning.

9          Defense counsel have talked a lot about it, and they

10   should, because, as I said before, this is a burden that we

11   embrace as the government, that we are proud to -- that we

12   are proud to bear.  We are.  The burden of proof is beyond a

13   reasonable doubt.  I just want to say a couple more things

14   about it.

15         First, it is not required that the government prove

16   guilt beyond all possible doubt.

17         What, then, is reasonable doubt?

18         Reasonable doubt is a doubt based upon reason and

19   common sense, not purely on speculation.

20         That's it.  That's the definition.

21         Even if you have doubt about one issue, one little

22   piece of the puzzle, that's not the same as reasonable doubt

23   as to guilt.  If viewing all of the evidence as a whole,

24   putting the pieces of the puzzle together, looking at that

25   picture, you do not have a doubt based on reason and common

1    sense, you should vote to find these defendants guilty.

2            Viewing the evidence as a whole, what does the picture

3    show?  What picture emerges here?

4            Putting the pieces together, they show that Don Parker

5    was a competitor at the steps.  That he agreed to the Wiley

6    program.  That he agreed not to bid at the public auctions

7    for round-robin houses.  That he participated in the

8    round-robins.  That if he won at a round-robin, even if it

9    was a house he himself had taken down at the public auction,

10   he would pay the losing bidders.  Then, if he lost, he would

11   accept money.  He admitted he did all the same things that

12   every other member of the group did.

13           Put together, what does the puzzle pieces show about

14   Andrew Katakis?  They show that he was the man in charge, in

15   charge of CEMG and Lenders Financial, that he controlled the

16   businesses and he called the shots.  He approved of all of

17   the expenses, especially the payoffs to the competitors.

18   That he knew, and he worked with, the regulars long before

19   Steve Swanger was ever in the picture.  That he used Wiley

20   Chandler to do his dirty work.  And he tried to disguise

21   payoffs as partner buyouts and full rehabs.  He tried to hide

22   the payoffs, even from his own accountant.  It shows that he

23   deleted documents, and tried to permanently erase evidence of

24   his participation in the scheme.

25           What does the picture show about Ted Longley?  Put

1   together, those puzzle pieces show that he was the group's

2   inside man.  He was supposed to be the referee, but he was

3   playing for one side.  He went out of his way to help the

4   group and to hide the scheme.  He took a thousand dollars a

5   day from the group in exchange for helping them control the

6   auctions and making sure no questions were raised.  His

7   fortune was tied to theirs.

8       Defense counsel tried to break up those puzzle pieces,

9   they tried to shake that box, but you've seen the picture,

10  and you see how they fit together.

11      Mr. Pfingst said a couple of times yesterday that

12  acquittals are victories for the government.  But, let's not

13  forget that society requires that those who are found guilty

14  beyond a reasonable doubt be convicted for their crimes.

15  Justice requires it.  Fairness requires it.  Society does not

16  win when the guilty get away with their crimes.  When that

17  happens, justice is dealt a serious blow and society suffers.

18      Based on the documents and the testimony that you have

19  heard over the last five weeks, there is more than enough

20  evidence that these defendants had the motive, had the means,

21  had the opportunity, and had the intent to commit the crimes

22  for which they have been charged, and they are guilty.

23      Thank you.

24      THE COURT:  Ladies and gentlemen of the jury, now that

25  you've heard all the evidence and the arguments of the

1  attorneys, it is my duty to instruct you on the law which

2  applies in this case.  A copy of these instructions will be

3  available in the jury room for you to consult if you should

4  find it necessary.

5         It is your duty to find the facts from all the

6  evidence in the case.  To those facts you will apply the law

7  as I give it to you.  You must follow the law as I give it to

8  you whether you agree with it or not.  You must not be

9  influenced by any personal likes or dislikes, opinions,

10  prejudices, or sympathies.  That means that you must decide

11  the case solely on the evidence before you.  You will recall

12  that you took an oath at the beginning of the trial promising

13  to do that.

14         In following my instructions, you must follow all of

15  them and not single out some and ignore others; they are all

16  important.  You must not read into these instructions or into

17  anything that I may have said or done any suggestion as to

18  what verdict you should return -- that is a matter entirely

19  up to you.

20         Each of the defendants has pleaded not guilty to the

21  charges against him in this case.  A defendant is presumed to

22  be innocent and does not have to testify or present any

23  evidence to prove his innocence.  The government has the

24  burden of proving every element of the charges against each

25  defendant beyond a reasonable doubt.

1          Now, proof beyond a reasonable doubt is proof that

2     leaves you firmly convinced that a defendant is guilty.  It

3     is not required that the government prove guilt beyond all

4     possible doubt.

5          A reasonable doubt is a doubt based upon reason and

6     common sense and is not based purely on speculation.  It may

7     arise from a careful and impartial consideration of all the

8     evidence, or from lack of evidence.

9          If after a careful and impartial consideration of all

10    the evidence, you are not convinced beyond a reasonable doubt

11    that a defendant is guilty, it is your duty to find that

12    defendant not guilty.  On the other hand, if after a careful

13    and impartial consideration of all the evidence, you are

14    convinced beyond a reasonable doubt that a defendant is

15    guilty, it is your duty to find that defendant guilty.

16         The evidence from which you are to decide what the

17    facts are consists of:

18         One, the sworn testimony of any witness.

19         Two, the exhibits which have been received into

20    evidence.

21         And three, any facts to which the lawyers have agreed

22    or stipulated.

23         In reaching your verdict, you may consider only the

24    testimony, exhibits, and stipulations received in evidence.

25    Certain things are not evidence, and you may not consider

1    them in deciding what the facts are.  I will list them for

2    you:

3            First, arguments and statements by the lawyers are not

4    evidence.  The lawyers are not witnesses.  What they've said

5    in their opening statements, closing arguments, and at other

6    times, is not evidence in the case.  It was intended to help

7    you interpret the evidence.  If the facts as you remember

8    them differ from the way the lawyers have stated them, your

9    memory of them controls.

10           Second, questions and objections by the lawyers are

11   not evidence.  Attorneys have a duty to their clients to

12   object when they believe a question is improper under the

13   rules of evidence.  You should not be influenced by an

14   objection or by the Court's ruling upon it.

15           Third, any testimony that has been excluded or

16   stricken, or that you've been instructed to disregard, is not

17   evidence and must not be considered.  In addition, some

18   testimony or exhibits may have been received only for a

19   limited purpose.  Whenever I have instructed you that an item

20   of evidence is admitted for a limited purpose, you must

21   consider it only for that purpose and for no other.

22           Fourth, the charges against each defendant are

23   contained in the indictment.  The indictment simply describes

24   the charges the government brings against the defendant.  The

25   indictment is not evidence and does not prove anything.  As I

1   instructed you earlier, each defendant has pleaded not guilty

2   to the charges in the indictment.

3       And fifth, anything that you may have seen or heard

4   when court was not in session is not evidence.  You are to

5   decide the case solely on the evidence received at the trial.

6       Now, evidence may be direct or circumstantial.  Direct

7   evidence is direct proof of a fact, such as testimony by a

8   witness about what that witness personally saw or heard or

9   did.  Circumstantial evidence is proof of one or more facts

10  from which you could find another fact.

11      You should consider both kinds of evidence.  The law

12  makes no distinction between the weight to be given to either

13  direct or circumstantial evidence.  It is for you to decide

14  how much weight to give to any evidence.

15      In deciding the facts in this case, you may have to

16  decide which testimony to believe and which testimony not to

17  believe.  You may believe everything a witness says, or part

18  of it, or none of it.

19      In considering the testimony of any witness, you may

20  take into account such things as:

21      The opportunity and ability of the witness to see or

22  hear or know the things testified to.

23      The witness' memory.

24      The witness' manner while testifying.

25      The witness' interest in the outcome of the case and

1   any bias or prejudice, if any.

2          Whether other evidence contradicted the witness'

3   testimony.

4          Whether the witness has in the past been convicted of

5   a felony or any other crime involving dishonesty.

6          The reasonableness of the witness' testimony in light

7   of all the evidence.

8          And any other factors that bear upon believability.

9          The weight of the evidence as to a fact does not

10  necessarily depend on the number of witnesses who testify.

11         A defendant in a criminal case has a constitutional

12  right not to testify.  No presumption of guilt may be raised,

13  and no inference of any kind may be drawn, from the fact a

14  defendant did not testify.  And the fact that a defendant has

15  not testified may not be discussed by you in the jury room.

16         Defendant Don Parker has testified.  You should treat

17  this testimony just as you would the testimony of any other

18  witness.  You have also heard evidence of defendant Parker's

19  character for truthfulness, honesty, trustworthiness and

20  reliability.  In deciding this case, you should consider that

21  evidence together with and in the same manner as all the

22  other evidence in the case.

23         You have heard testimony from witnesses who received

24  benefits from the government in connection with this case.

25  The testimony of those witnesses was given in exchange for a

promise of certain benefits from the government.  You have

also heard testimony from witnesses who received a promise

from the government that their testimony would not be used

against them.

Some witnesses have also pleaded guilty to crimes

arising out of the same events for which the defendants are

now on trial.  Those guilty pleas are not evidence against

the defendants, and you may consider them only in determining

the believability of those witnesses.

For these reasons, in evaluating the testimony of

those witnesses, you should consider the extent to which or

whether their testimony may have been influenced by any of

these factors.  In addition, you should examine the testimony

of those witnesses with greater caution than that of other

witnesses.

You've heard testimony from persons who, because of

education and experience, were permitted to state their

opinions, and the reasons for those opinions.  Those

witnesses are sometimes referred to as expert witnesses.

Such expert or opinion testimony should be judged just

like any other testimony.  You may accept it or reject it,

and give it as much weight as you think it deserves,

considering the witness' education and experience, the

reasons given for the opinion, and all the other evidence in

the case.

1      Certain charts and summaries have been admitted into

2  evidence.  Charts and summaries are only as good as the

3  underlying material on which they're based.  You should

4  therefore give them only such weight as you think the

5  underlying material deserves.

6      During the trial, other charts or summaries were shown

7  to you in order to help explain the evidence in the case.  A

8  chart or summary that has not been received into evidence is

9  not itself proof of any facts.  If those charts or summaries

10  do not correctly reflect the facts or figures shown by the

11  evidence in the case, you should disregard those charts and

12  summaries, and determine the facts from the underlying

13  evidence.

14      I will now instruct you on the law as it applies to

15  the specific charges brought against the defendants in this

16  case.  There are three defendants in the case:  Andrew

17  Katakis, Donald Parker and W. Theodore Longley.  All three

18  defendants are charged in Count 1 with a conspiracy in

19  violation of the Sherman Antitrust Act, Section 1 of Title 15

20  of the United States Code, and in Count 2 with conspiracy to

21  commit mail fraud, in violation of Section 1349 of Title 18

22  of the United States Code.  Defendant Katakis is charged in

23  Count 3 with obstruction of justice, in violation of

24  Section 1519 of Title 18 of the United States Code.

25      A separate crime is charged in each count.  You must

1    reach a separate, unanimous decision on the elements of each

2    count as against each defendant.  Your verdict on one count

3    should not control your verdict on any other count, and you

4    do not have to return the same verdict for all counts.

5        Although the defendants are being tried together, you

6    must give separate consideration to each defendant.  In doing

7    so, you must determine which evidence in the case applies to

8    each defendant, disregarding any evidence admitted solely

9    against some other defendant.  The fact that you may find one

10   of the defendants guilty or not guilty should not control

11   your verdict as to any other defendant.

12       You are here only to determine whether each defendant

13   is guilty or not guilty of the charges against him in the

14   indictment.  Your determination must be made only from the

15   evidence in the case.  The defendants are not on trial for

16   any other conduct or offenses not charged in the indictment.

17   You should consider evidence about the acts, statements, and

18   intentions of others, or evidence about other acts of a

19   defendant, only as they relate to the charges against each

20   defendant in the indictment in this case.

21       The indictment also charges that the offenses were

22   committed on or about a certain date.  The government need

23   not prove beyond a reasonable doubt the exact date of each

24   alleged offense.  It is sufficient if the government proves

25   beyond a reasonable doubt that each offense was committed on

1    a date or dates reasonably near the date or dates charged.

2         Because the charges in Counts 1 and 2 involve alleged

3    conspiracies, I will begin by telling you what constitutes a

4    conspiracy.  A conspiracy is kind of a criminal

5    partnership -- an agreement of two or more persons to commit

6    one or more crimes.  The crime of conspiracy is the agreement

7    to do something unlawful; it doesn't matter whether the crime

8    agreed upon was actually committed.  For a conspiracy to have

9    existed, it is not necessary that the conspirators made a

10   formal agreement or that they agreed on every detail of the

11   conspiracy.  It is not enough, however, that they simply met,

12   discussed matters of common interest, acted in similar ways,

13   or perhaps helped one another.  You must find that there was

14   a plan to commit at least one of the crimes alleged in the

15   indictment as an object of the conspiracy with all of you

16   agreeing as to the particular crime which the conspirators

17   agreed to commit.

18        One becomes a member of a conspiracy by willfully

19   participating in the unlawful plan with the intent to advance

20   or further some object or purpose of the conspiracy, even

21   though the person does not have full knowledge of all the

22   details of the conspiracy.  Furthermore, one who willfully

23   joins an existing conspiracy is as responsible for it as its

24   originators, and it is not necessary that all members of the

25   conspiracy join at the same time.  On the other hand, one who

1    has no knowledge of a conspiracy, but happens to act in a way

2    which furthers some object or purposes of the conspiracy,

3    does not thereby become a conspirator.  Similarly, a person

4    does not become a conspirator merely by associating with one

5    or more persons who are conspirators, nor merely by knowing

6    that a conspiracy exists.

7         One may become a member of a conspiracy without full

8    knowledge of all the details of the unlawful scheme, or the

9    names, identities, or locations of all the other members.

10   Even if a defendant did not directly conspire with the other

11   defendants or coconspirators in the overall scheme, the

12   defendant has, in effect, become a member of the conspiracy

13   if the government proves each of the following beyond a

14   reasonable doubt:

15        One, the defendant directly conspired with one or more

16   conspirators to carry out at least one of the objects of the

17   conspiracy.

18        Two, the defendant knew or had reason to know that

19   other conspirators were involved with those with whom the

20   defendant directly conspired.

21        And three, the defendant had reason to believe that

22   whatever benefits the defendant might get from the conspiracy

23   were probably dependent upon the success of the entire

24   venture.

25        It is not a defense that a person's participation in a

1    conspiracy was minor or for a short period of time.

2          The government must prove that the defendant was a

3    member of the particular conspiracy charged in that count of

4    the indictment.  If you find that the conspiracy charged in

5    each count did not exist, then you must return a verdict of

6    not guilty, even though you may find that some other

7    conspiracy may have existed.  Similarly, if you find that any

8    defendant was not a member of the charged conspiracy, then

9    you must find that defendant not guilty, even though that

10   defendant may have been a member of some other conspiracy.

11         All three defendants, Katakis, Parker and Longley, are

12   charged in Count 1 with a conspiracy in violation of the

13   Sherman Antitrust Act.  In order for a defendant to be found

14   guilty of a violation of the Sherman Antitrust Act, the

15   government must prove each of the following elements beyond a

16   reasonable doubt:

17         First, that a conspiracy existed between two or more

18   actual or potential competitors to eliminate, reduce, or

19   interfere with competition at San Joaquin County real estate

20   foreclosure auctions in or about September of 2008 until in

21   or about October of 2009.

22         Second, that the defendant knowingly became a member

23   of that conspiracy knowing of at least one of its objects and

24   intending to help accomplish it.

25         And third, that the conspiracy occurred within the

1   flow of interstate commerce.

2          The parties have stipulated that the sales at the San

3   Joaquin County real estate foreclosure auctions in this case

4   were an integral part of foreclosure transactions involving

5   the transfer of funds from California to entities in other

6   states, which satisfies the third element.  You therefore

7   need only to decide whether the government has proved each of

8   the first two elements beyond a reasonable doubt.

9          Under the first element, and for the purposes of a

10  violation of the Sherman Antitrust Act, a conspiracy between

11  two or more actual or potential competitors to eliminate,

12  reduce, or interfere with competition at an auction can occur

13  in different ways.  It can be an agreement among some or all

14  of the competitors about the price or prices to be bid, who

15  should be the successful bidder, who should bid high, who

16  should bid low, or who should refrain from bidding; or any

17  other agreement with respect to bidding that affects, limits,

18  or avoids competition among some or all of the bidders.

19         The mere fact that one or more defendants may have

20  unilaterally refrained from bidding, however, does not

21  violate the Sherman Antitrust Act.  Where a person, in the

22  exercise of his own independent judgment, and not by

23  agreement with his competitors, chooses not to bid on a

24  particular auction, there is no violation.  It is only where

25  such acts are done pursuant to an agreement between two or

1    more actual or potential competitors that a violation occurs.

2    A non-competitor can also join a conspiracy amongst

3    competitors.

4           The aim and result of every agreement that violates

5    the Sherman Antitrust Act, if successful, is the elimination

6    of one form of competition.  Every such agreement is

7    unlawful, regardless of the motives of the parties or any

8    economic justification.  Therefore, if you find that a

9    conspiracy in violation of the Sherman Antitrust Act existed,

10   it does not matter whether the sales prices were too high or

11   too low, reasonable or unreasonable, fair or unfair, or

12   whether members of the conspiracy may have had good motives

13   or thought that what they were doing was legal.  It is also

14   not a defense that the conspirators actually competed with

15   each other in some manner or that they did not conspire to

16   eliminate all competition.

17          Individuals are not actual or potential competitors

18   for purposes of the Sherman Antitrust Act if they were

19   engaged in a legitimate joint venture or partnership and were

20   thus acting together as a single entity.  A joint venture or

21   partnership exists when persons who would otherwise be

22   competitors combine their resources for a common purpose and

23   share the risks as well as the opportunities for gain.  A

24   joint venture or partnership is legitimate only if it has a

25   purpose other than the very crime charged, here the agreement

to eliminate, reduce, or interfere with competition at the

foreclosure auctions.  It is not necessary that the members

of a joint venture or partnership share equally in the risks

or gains.

One or more members of a legitimate joint venture or

partnership cannot lawfully agree to eliminate, reduce, or

interfere with competition with a competitor outside the

joint venture or partnership.  However, if one member of a

joint venture or partnership agrees with an outside

competitor in this way, another individual's membership in

the joint venture or partnership alone does not establish

that he is also a part of the agreement.  Rather, as I have

instructed you earlier, to find a defendant guilty of a

Sherman Antitrust Act violation, you must find that he

knowingly became a member of the conspiracy to eliminate,

reduce, or interfere with competition.

A winning bidder does not violate the Sherman

Antitrust Act simply by selling his right to purchase a

property won at a foreclosure auction.  After a foreclosure

auction sale, the winning bidder may pay the amount of the

winning bid and take title to the property, or the winning

bidder may sell his right to purchase the property to another

individual or entity.  That individual or entity may then

take title in the individual or entity's own name.  There is

no requirement that the winning bidder list himself or

1    herself on the receipt of funds form.  It violates the

2    Sherman Antitrust Act, however, for a winning bidder to sell

3    his right to purchase a property as part of a conspiracy

4    between two or more actual or potential competitors to

5    eliminate, reduce, or interfere with competition.

6         Prospective bidders may hire agents to bid on their

7    behalf, and actual or potential competitors may agree to use

8    a common agent in order to bid on their behalf, but

9    prospective bidders who would otherwise be competitors may

10   not agree to use a common agent as a means to eliminate,

11   reduce or interfere with competition.

12        The law does not require an auctioneer at a

13   foreclosure auction to cry properties in a certain order,

14   verify funds prior to an auction, or collect money

15   immediately following a sale.

16        Under the second element of Count 1, the government

17   must prove that each defendant knowingly became a member of

18   the conspiracy.  An act is done knowingly if a defendant is

19   aware of the act, and does not act or fail to act through

20   ignorance, mistake or accident.  The government is not

21   required to prove that a defendant knew that his acts or

22   omissions were unlawful.  You may consider evidence of a

23   defendant's words, acts, or omissions, along with all the

24   other evidence, in deciding whether a defendant acted

25   knowingly.

1           All three defendants, Katakis, Parker and Longley, are

2    also charged in Count 2 of the indictment with conspiracy to

3    commit mail fraud.  In order for a defendant to be found

4    guilty of conspiracy to commit mail fraud, the government

5    must prove each of the following elements beyond a reasonable

6    doubt:

7           First, that beginning in or about September of 2008

8    and ending in or about October of 2009, there was a

9    conspiracy between two or more persons to commit mail fraud.

10          And second, that the defendant knowingly became a

11   member of that conspiracy knowing of the plan to commit mail

12   fraud and intending to help accomplish it.

13          As I previously explained, an act is done knowingly if

14   a defendant is aware of the act and does not act or fail to

15   act through ignorance, mistake, or accident.  The government

16   is not required to prove that a defendant knew that his acts

17   or omissions were unlawful.  You may consider evidence of a

18   defendant's words, acts, or omissions, along with all the

19   other evidence, in deciding whether a defendant acted

20   knowingly.

21          Under Count 2, the government is not required to prove

22   that a person actually committed mail fraud, but you must

23   understand what mail fraud is.  Mail fraud occurs when a

24   person has done all of the following:

25          First, the person knowingly participated in, devised,

1    or intended to devise a scheme or plan to defraud, or a

2    scheme or plan for obtaining money or property by means of

3    false or fraudulent pretenses, representations, or promises.

4         And second, that the statements were made or the facts

5    were omitted as part of that scheme.

6         And third, that the statements made or facts omitted

7    pursuant to the scheme were material; in other words, that

8    they had a natural tendency to influence, or were capable of

9    influencing, a decisionmaking body to part with money or

10   property.

11        And fourth, that the person acted with the intent to

12   defraud.  In other words, the intent to deceive or cheat.

13        And fifth, that the person used or caused to be used

14   the mails to carry out or attempt to carry out an essential

15   part of the scheme.  A mailing is caused when one knows that

16   the mails will be used in the ordinary course of business or

17   when one can reasonably foresee such use.  It doesn't matter

18   whether the material mailed was itself false or deceptive so

19   long as the mail was used as a part of the scheme, nor does

20   it matter whether the scheme or plan was successful, or that

21   any money or property was actually obtained.

22        Defendant Katakis alone is charged in Count 3 with

23   obstruction of justice.  In order for Katakis to be found

24   guilty under Count 3, the government must prove each of the

25   following elements beyond a reasonable doubt:

1          First, that defendant Katakis knowingly altered,

2     destroyed, or concealed electronic records or documents.

3          And second, that defendant Katakis acted with the

4     intent to impede, obstruct, or influence an investigation

5     that he either knew of or contemplated.

6          And third, that the investigation was about a matter

7     by or within the jurisdiction of the United States Department

8     of Justice or the Federal Bureau of Investigation.

9          Under the first element, an act is done knowingly if

10    the defendant was aware of the act and does not act through

11    ignorance, mistake, or accident.  Again, the government is

12    not required to prove that the defendant knew that his acts

13    or omissions were unlawful.  And you may consider evidence of

14    the defendant's words, acts, or omissions, along with all the

15    other evidence, in deciding whether the defendant acted

16    knowingly.

17         A defendant may be found guilty of a crime charged

18    even if that defendant personally did not commit the act or

19    acts constituting the crime but aided and abetted in its

20    commission.  To prove a defendant guilty because the

21    defendant aided and abetted in the commission of the crime,

22    the government must prove each of the following beyond a

23    reasonable doubt:

24         First, that the crime charged was committed by

25    someone.

1          Second, that the defendant knowingly and intentionally

2     aided, counseled, commanded, induced, or procured that person

3     to commit each element of the crime charged.

4          And third, the defendant acted before the crime was

5     completed.

6          It is not enough that a defendant merely associated

7     with the person committing the crime, or unknowingly or

8     unintentionally did things that were helpful to that person,

9     or was present at the scene of the crime.  The evidence must

10    show beyond a reasonable doubt that the defendant acted with

11    the knowledge and intention of helping that person commit the

12    crime charged.

13         The punishment provided by law for the crimes charged

14    in this case is for the Court to consider.  You may not

15    consider punishment in deciding whether the government has

16    proved its case against the defendants beyond a reasonable

17    doubt.

18         Now, when you begin your deliberations, you should

19    select one member of the jury to act as your foreperson.

20    That person will preside over your deliberations and speak

21    for you here in court.

22         You will then discuss the case with your fellow jurors

23    to reach agreement if you can do so.  Your verdicts must be

24    unanimous.

25         Each of you must decide the case for yourself, but you

1     should do so only after you have considered all of the

2     evidence, discussed it fully with the other jurors, and

3     listened to the views of your fellow jurors.

4          Don't be afraid to change your opinion if the

5     discussion persuades you that you should.  But don't come to

6     a decision simply because the other jurors think it's right.

7          It is important that you attempt to reach a unanimous

8     verdict but, of course, only if each of you can do so after

9     having made your own conscientious decision.  Don't change an

10    honest belief about the weight and effect of the evidence

11    simply to reach a verdict.

12         Because you must base your verdict only on the

13    evidence received in the case and on these instructions, I

14    must remind you again that you must not be exposed to any

15    other information about the case or the issues it involves.

16    Except for discussing the case with your fellow jurors during

17    your deliberations, do not communicate with anyone in any way

18    and do not let anyone else communicate with you in any way

19    about the merits of the case or anything to do with it, and

20    again, do not seek or receive any information from any

21    outside source about the case or anything to do with it.

22         Some of you have taken notes during the trial.

23    Whether or not you took notes, you should rely on your own

24    memory of what was said.  You may take your notes into the

25    jury room and refer to them during your deliberations, but

1    they are only to assist your memory.  You should not be

2    overly influenced by the notes.

3         Verdict forms have been prepared for you.  There are

4    three separate verdict forms, one pertaining to Defendant

5    Katakis, one pertaining to Defendant Parker, and one

6    pertaining to Defendant Longley.

7         On Defendant Parker's verdict form, it states:  We,

8    the jury, find the defendant Andrew -- excuse me.  On

9    Parker's -- I'm going to refer to Katakis' verdict form

10   first.

11        On defendant Katakis' verdict form it states:  We, the

12   jury, find the defendant, Andrew Katakis, as follows:  And

13   then there is a space as to each of the three counts for your

14   foreperson to check either guilty or not guilty, as the case

15   may be, and then there is a space for the form to be dated

16   and signed by your foreperson.

17        On the separate form pertaining to Donald Parker,

18   there are spaces for your foreperson to fill in either guilty

19   or not guilty, as the case may be, on each of Counts 1 and 2.

20   There is no Count 3 pertaining to Donald Parker.

21        Finally, on the verdict form pertaining to

22   Mr. Longley, there is a space for your foreperson to fill in

23   either guilty or not guilty as to each of Counts 1 and 2.

24   There is no Charge 3 against defendant Longley.  And, again,

25   a space for the foreperson to fill in the date and signature.

1        After you've reached unanimous agreement on a verdict,

2   your foreperson will fill in the forms, sign and date them,

3   and advise the court through the marshal outside your door

4   that you are ready to return to the courtroom.

5        If it should become necessary during your

6   deliberations to communicate with me, you may send a note

7   through the marshal outside the door, and you'll be provided

8   with some paper that you can use to write your notes.  The

9   note should be signed by your foreperson or by one or more

10  members of the jury.  No member of the jury should ever

11  attempt to communicate with me except by a signed writing;

12  and I will communicate with any member of the jury on

13  anything concerning the case only in writing, or orally here

14  in open court.  If you send out a question, I will consult

15  with the lawyers before answering it.  That may take some

16  time.  So you may continue your deliberations while you're

17  waiting for an answer to any question.  Remember, though,

18  that you are not to tell anyone, including me, how the jury

19  stands, numerically or otherwise, until after you have

20  reached unanimous agreement on a verdict or have been

21  discharged.  Do not disclose any vote count in any note that

22  you send to the Court.

23        Do counsel for either party have any objections or

24  exceptions to note to these instructions as given?

25        MR. PFINGST:  No, Your Honor.

1          MS. PLETCHER:  No, Your Honor.

2          MR. TEDMON:  No, Your Honor.

3          MR. BOCKMON:  No, Your Honor.

4          THE COURT:  Very well.  Then at this point I'm going

5     to ask the clerk to administer the oath to the marshal.

6          THE CLERK:  Yes, Your Honor.

7          Please raise your right hand.

8          (Marshal representative sworn.)

9          MARSHAL REPRESENTATIVE:  I do.

10         THE COURT:  At this point, before I send the jury in

11    to deliberate, I'm going to ask that Ms. Gonzalez-Cisneros,

12    Ms. Svoboda and Mr. Graves, if you've left anything in the

13    jury room, could you get it now and then come back to court.

14         And I'm also going to have the clerk, as soon as

15    possible after you retire to the jury room, bring in all of

16    the exhibits, and a copy of my instructions, and the verdict

17    forms, which will -- which will be there as soon as she can

18    get them in the jury room.

19         With regard to lunch, while you're deliberating,

20    you're with the marshal, so the marshal will make

21    arrangements for your lunch.

22         All right.  The jurors will retire to the jury room at

23    this time to deliberate on a verdict.  And I'll ask that

24    Ms. Gonzalez-Cisneros, Ms. Svoboda and Mr. Graves remain

25    here.

1          (Jury not present.)

2          THE COURT:  All right.  Ms. Gonzalez-Cisneros,

3    Ms. Svoboda and Mr. Graves, this is the hardest part for you

4    because you don't get to deliberate with the other jurors.

5    And that's unfortunate, because it's part of the trial that

6    you don't get to experience.

7          It is possible that something could happen to one of

8    the jurors during deliberations, in which case we may call

9    upon one of you to go in and take the place of that juror who

10   is deliberating.  So, we do ask you to continue to heed the

11   Court's admonition, but we allow you to go home, and to go

12   back to work, subject to being called by the clerk in the

13   event that we need you.

14         Now, I'm going to be sure that the clerk calls you as

15   soon as the trial is over, because I don't want you to have

16   to spend the rest of your lives not talking about this case,

17   or not getting any information that might relate to the case.

18         I remember what counties you live in, but I don't

19   remember what -- exactly where you live.

20         Ms. Gonzalez-Cisneros, where do you live?

21         ALTERNATE JUROR GONZALEZ-CISNEROS:  I live in the City

22   of Citrus Heights.

23         THE COURT:  Citrus Heights.  All right.  Good.  What

24   was your job?

25         ALTERNATE JUROR GONZALEZ-CISNEROS:  I work with the

1    Board of Equalization.

2         THE COURT:  All right.  So, you'll be permitted to go

3    back to work while you're waiting, but remain available by

4    phone so that the clerk can get ahold of you.

5         ALTERNATE JUROR GONZALEZ-CISNEROS:  Yes.

6         THE COURT:  And Ms. Svoboda, where do you live?

7         ALTERNATE JUROR SVOBODA:  Davis.

8         THE COURT:  You live in Davis.  What is your job?

9         ALTERNATE JUROR SVOBODA:  I'm a medical physicist.

10        THE COURT:  Oh, right.  Right.  So, you'll also be

11   able to go back to work while you're waiting.

12        Mr. Graves.

13        ALTERNATE JUROR GRAVES:  Tracy, California.

14        THE COURT:  Tracy.  And what is your job?

15        ALTERNATE JUROR GRAVES:  Retired.

16        THE COURT:  You're retired.  All right.  Well, if you

17   wanted to wait around here, you could.  But, if you want to

18   go home, the same applies to you, keep in touch with the

19   clerk.

20        Leave your badges, however, on your seats, because if

21   we don't need you again, I don't want you to have to go out

22   and retrieve the badges.  So, leave the badges on the seats,

23   but take your books with you.

24        If you get called by the clerk and told the trial is

25   over, I want you to know it's with the thanks of the Court

1    and all parties concerned.  We really do appreciate those

2    that serve who only stand in wait.

3         I was actually, to be honest with you, surprised that

4    we didn't lose somebody during the course of the trial

5    because it was such a long trial, and we were going through

6    the flu season, and the bad weather that I anticipated, and I

7    just thought that it was safe to impanel all of the alternate

8    jurors that we could.  If I had known that everybody was

9    going to be so diligent and stay so healthy, and that we

10   weren't going to need to replace any jurors, I probably would

11   not have impanelled all four of the alternates.

12        But, be that as it may, we really do appreciate the

13   fact that you were just as attentive, and just as diligent

14   about your job, took it just as seriously as the jurors.

15   And, in a way, I'm sorry that you don't get to participate in

16   the deliberations as well, but that's the way the system

17   works.

18        All right.  You're excused now.  Keep in touch.  And

19   if we need you, you will hear from us.  If you don't need

20   you, you'll hear when the trial is over.

21        Counsel, you can just hang around until noon, and then

22   you can be gone until 1:30.  After that I do need that -- I

23   do need to have your assurance that you will be available, in

24   the event that we call you, on ten minutes or less notice.

25        MR. PFINGST:  And, Your Honor, the jury will stop

1    deliberating at 4:30?

2         THE COURT:  Well, yes, today they will.  I'm going to

3    bring them in probably a little bit before 4:30 and excuse.

4         MR. PFINGST:  Does the Court want counsel to be

5    present?

6         THE COURT:  Yes.  Yes.  What I like is to have you

7    present when I discharge them in the evening so they

8    appreciate that we've all been waiting for them.  But I don't

9    need you here in the morning, I have them report directly to

10   the jury room, and they can start their deliberations as soon

11   as all 12 of them are present.  So, you don't need to be in

12   the courtroom when they arrive in the morning, but you do

13   when they leave at night.

14        MR. PFINGST:  Before we go, Your Honor, I'd just like

15   to take an opportunity to bring to your attention the

16   cooperation of your staff.  They are among the most

17   cooperative I've had the pleasure to work with in my years as

18   an attorney.  I think that reflects well on the Court.  But,

19   I know Karen is not here, so I didn't want --

20        THE COURT:  I was going to say, I'm going to have to

21   get a transcript of this now.

22        MR. PFINGST:  But it's been a real delight to have

23   professionals as cooperative as this to work with.

24        THE COURT:  I'll pass the word along.

25        MS. PLETCHER:  Your Honor, I have a couple of points

1    to raise before we adjourn.

2           THE COURT:  All right.

3           MS. PLETCHER:  One, and I'm sorry that I have to bring

4    this up, but a couple times over the last -- during the

5    course of this trial, Mr. Katakis has confronted prosecution

6    outside the courtroom.  And I know that this is a

7    difficult -- I appreciate this is a difficult time for

8    Mr. Katakis, but I don't know what Your Honor's usual

9    practice is, but I request that there would be appropriate

10   security whenever a verdict comes back.

11          THE COURT:  I doubt that that's necessary, but we

12   always do have, by definition, the marshal who is in charge

13   of the jury is present when the jury comes in, and I -- do

14   you agree that would be sufficient?

15          MS. PLETCHER:  I do.  I just want to bring it to Your

16   Honor's attention and make sure.

17          THE COURT:  Now that you've mentioned it, I'm sure

18   everybody knows that any attempt to intimidate a prosecutor,

19   or anybody associated with the government, would be,

20   obviously, seriously a mistake, and would result in

21   consequences.

22          MS. PLETCHER:  Thank you.

23          Other issues:  One is the post-trial briefing

24   schedule, the Rule 29 motions, is there -- do we want to set

25   a briefing schedule for that right now?

1          THE COURT:  No, I don't.  I want to know what the

2    verdict is before I decide whether that's necessary.

3          MS. PLETCHER:  Okay.

4          THE COURT:  And I may or may not need additional

5    briefs on it.  I may prefer to either decide it on what I've

6    already heard, or to hear oral arguments in lieu of briefs.

7    The problem with briefs is it takes so long that my memory

8    fades, just like the witnesses that you were talking about,

9    and I could probably do a better analysis of it as soon as

10   possible after I've heard the evidence and the arguments.

11         MS. PLETCHER:  I understand.

12         And, finally, I, like Mr. Pfingst, do wish to thank

13   the Court and thank the staff.  I'll be leaving for a very

14   long-planned vacation on Sunday, and if the verdict comes

15   back during the time that I'm gone, I just wanted to express

16   my thanks and appreciation to defense counsel and the Court

17   for professionalism and a very well-run trial.

18         THE COURT:  All right.  Now, if you're not here, I

19   don't want to hear that they have to call you by phone, or

20   that your appearance is in any way necessary.  I'm going to

21   assume that the other prosecutors can handle it without you.

22         MS. PLETCHER:  That's exactly right.  So, in my

23   absence, Ms. Heye will be leading the team, and any issues

24   should be directed to her.

25         THE COURT:  All right.

1          MS. PLETCHER:  Thank you.

2          THE COURT:  All right.

3          (Court in recess pending deliberations.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          SACRAMENTO, CALIFORNIA

2          WEDNESDAY, MARCH 5, 2014, 4:22 p.m.

3                    ---oOo---

4          THE COURT:  Did Ms. Pletcher take off for her vacation

5     already?

6          MS. HEYE:  She had to attend a memorial service this

7     afternoon, Your Honor.

8          THE COURT:  Everybody, with the exception of

9     Ms. Pletcher, is present.

10         I wanted to let you know that right after lunch I sent

11    in 12 more copies of the jury instructions.  As I was

12    delivering the instructions orally, it occurred to me that

13    one copy in the jury room may not be enough, that they're

14    relatively complex, so I sent in 12 more copies.

15         It's a little after 4:20.  I propose that we bring the

16    jury out now and I excuse them for the evening.

17         MR. TEDMON:  That's fine.

18         MR. SCOBLE:  That's agreeable.

19         MS. HEYE:  That's fine.

20         THE COURT:  Let's bring the jury in.

21         (Jury present.)

22         THE COURT:  The jurors are all present.

23         Ladies and gentlemen, have you selected a foreperson?

24         JUROR ORLANDO:  Yes, Your Honor, we have.

25         THE COURT:  Who is your foreperson?

1      JUROR ORLANDO:  That would be me.

2      THE COURT:  All right.  Mr. Orlando.

3      I'm proposing that you go home for the evening and

4  resume with your deliberations at 9:00 o'clock tomorrow

5  morning.

6      Would that be satisfactory?

7      JUROR ORLANDO:   (Nodding head.)

8      THE COURT:  You may leave your materials in the jury

9  room.  It will be locked, and nobody will interfere with what

10  you have in there.

11      When you come back tomorrow morning, report directly

12  to the jury room, and you may resume with your deliberations

13  as soon as all 12 of you are present.  Don't continue to

14  deliberate this afternoon after one or more of you leave.

15  And avoid the temptation to discuss the case with one or two

16  or less than all of the jurors present while we're in recess.

17  As soon as all 12 of you are there tomorrow morning, you may

18  resume with your deliberations.

19      It is all the more important that you remember that

20  part of the admonition that precludes you from discussing the

21  case with anyone else, and from seeking or receiving

22  additional information, because it does become tempting to do

23  that.  Once you start to form and express opinions, which you

24  couldn't do up to this point, the temptation is to continue

25  to discuss the case after you've started to do so.  But,

1    avoid that temptation.  Don't keep the wheels rolling and

2    start talking to your spouse or somebody else about the case.

3           Again, the best suggestion I can give is put it on the

4    back burner this evening, and then it will pick up again for

5    you tomorrow morning after you're all present.

6           Now, you don't have the alternates, so stay healthy,

7    we need all 12 of you.

8           Have a nice evening.  And as soon as you're all back

9    in the jury room at 9:00 o'clock tomorrow morning, resume

10   your deliberations.

11           (Jury not present.)

12           THE COURT:  Counsel, anything else before we adjourn?

13           MR. BOCKMON:  No, Your Honor.  Thank you.

14           MR. TEDMON:  No, Your Honor.

15           MR. PFINGST:  No, Your Honor.

16           THE COURT:  All right.

17                  (Proceedings adjourned, 4:27 p.m.)

18                          ---oOo---

19

20

21

22

23

24

25

1        SACRAMENTO, CALIFORNIA

2        THURSDAY, MARCH 6, 2014, 10:18 a.m.

3                    ---oOo---

4        THE COURT:  The order -- when he gets here, the order

5    is going to be that all defendants remain in the building

6    while the jury is deliberating.

7        You know what's going to happen?  I'll tell you what's

8    going to happen.  There is a bunch of kids in this building

9    for the so-called Open Doors To Justice, and he's not going

10   to be able to get through the screening.  So, go downstairs

11   and get him through the screening.

12       MR. BOCKMON:  Yes, Your Honor.  If he comes in while

13   I'm gone, please start without me.

14       THE COURT:  Yes, we have Mr. Scoble here.

15       (Pause in proceedings.)

16       THE COURT:  Mr. Longley, have a seat over here.  I

17   understand you were outside the building in your car.  The

18   order from here on --

19       MR. SCOBLE:  Your Honor, I'm sorry, I don't think he

20   heard what you said.

21       THE COURT:  How do you hear the auctions?  Never mind.

22   Never mind.  Never mind.  It just says you have to be

23   present, it doesn't say you have to have your hearing aids

24   in.

25       The order is that while the jury is deliberating, all

1   defendants shall remain in the building.  It is so ordered.

2       Now, the Court has received a note from the jury.  It

3   came at 10:00 o'clock in the morning.  We weren't able to

4   address it until now because Mr. Longley was not present.

5       It says, The jury requests the following:  Can we

6   review a printed transcript of Don Parker's complete

7   testimony.

8       I went back and I looked at the notes of what I said

9   to the jury at the time that I gave them my opening remarks,

10  immediately after they took the oath, and I said, The court

11  reporter is here taking down what we say in shorthand.  That

12  does not mean, however, there is going to be a written

13  transcript of the testimony for you to consult at the end of

14  the trial, or at any other time.  There will not be a written

15  transcript.  So, it is important that you listen to the

16  testimony of the witnesses as it is given.

17      I also told them that they had their notebooks, and

18  they could take notes if they wished to do so.

19      Now, I could simply say no; that's one answer.  I

20  could go back and remind them of what I told them at the

21  beginning of the trial.  Or, I could do something else, if

22  you all agree a different response would be appropriate.

23      So, Ms. Pletcher, I'll hear from you first.

24      MS. PLETCHER:  Well, it seems to me the Court should

25  be consistent with what you said earlier on.  We have no

1    objection if there is some alternative solution, I don't have

2    one to propose right now, so --

3          THE COURT:  If I were to give them a transcript of Don

4    Parker's testimony, we would first have to have the court

5    reporter prepare it, and I don't know how long that would

6    take.  Secondly, that simply opens the door to the next

7    question, can we have the complete testimony of somebody

8    else.  I don't know why we bother to bring them in for the

9    first 18 days of trial, we could just bring them in for the

10   closing arguments and give them transcripts of all the

11   testimony that occurred before they got here.  That's

12   sarcastic, but that would be the result if I were to accede

13   to this request.

14         MS. PLETCHER:  I understand that concern, and I know

15   it does take quite a while to prepare a certified transcript.

16         If Your Honor wants to bring them in and remind them

17   of their instruction, I think that would be totally

18   appropriate.  It may be preferable to just saying no, because

19   then the jury would understand what the Court's reasoning is.

20         THE COURT:  All right.

21         Mr. Pfingst, what would you suggest?

22         MR. PFINGST:  I would recommend that the Court

23   indicate there is no transcript.  If the jurors need a

24   portion of testimony read back, it would be helpful if they

25   would identify that particular portion of testimony, and it

1    will have to be read back by the court reporter --

2              THE COURT:  But here is what happens when you do that,

3    they can't identify a portion of testimony because they don't

4    know how to identify it.

5              MR. PFINGST:  I understand.

6              THE COURT:  So they will say, we want the part of Don

7    Parker's testimony where he says such and such.  There are a

8    couple of problems with that.  One, it tends to flag what it

9    is they're talking about, and that wouldn't be right to do

10   so.  And, second, it means that I have to talk to you again

11   and decide which parts of the transcript it is that we should

12   give them in order to respond to their request.  And

13   invariably what happens is we always end up throwing up our

14   hands and saying we'll read all of the testimony.

15             MR. PFINGST:  I agree with Your Honor.  Generally,

16   it's the Court that's more resistant to my suggestion that

17   the jurors be told, when you request the testimony of a

18   witness it will be read back to you, but we will read back

19   entire testimony of the witness.

20             THE COURT:  And then they'll say yes.  That's what

21   they're going to say.

22             MR. PFINGST:  And that -- that's just the baggage that

23   comes with deliberations at times.  Jurors want to hear

24   readbacks, and they, from time to time, have to get them.

25             THE COURT:  But where is the case law that says when

1    the jury asks to have something reread that I have to have

2    the reporter reread it to them?  I don't think that's the

3    case law.  If it was, then there would really be no reason to

4    tell the jury to take careful notes, to listen very

5    carefully, to rely upon their cumulative recollection of what

6    was said.  There would be no reason for that.  We would just

7    say, whenever you want to come back in, you have an absolute

8    right to have anything you want reread.

9         MR. PFINGST:  This is where I just have to disagree

10   with the Court.  There is a reason why we have a court

11   reporter, and this is one of the reasons why there is a court

12   reporter.  I have never heard of a Court declining --

13        THE COURT:  All right.  I'll do it.  I'll do.

14        MR. TEDMON:  Can I be heard on this?

15        THE COURT:  Yes.  Now we've got a difference -- we're

16   going to have Mr. Tedmon saying he doesn't want it reread.

17        MR. TEDMON:  That's correct.

18        MR. PFINGST:  That may be.  I'm just concerned about

19   down the line setting a precedent with Your Honor that may

20   affect any future notes from the jury.  So, you know.

21        MR. TEDMON:  We can take those up at the time.  I --

22   Your Honor is spot on.  You gave the jury instructions that

23   they will not have -- the transcript would not be available.

24   Everyone in closing argument said the jury has been

25   attentive, which they have, they've taken notes, they need to

1    rely on that.  I just don't want that.

2           THE COURT:  What about you, Mr. Bockmon?

3           MR. BOCKMON:  I join Mr. Tedmon, Your Honor.

4           THE COURT:  So, I have two that want it not to be

5    reread, and one that says he may or may not want it reread,

6    he just doesn't want a precedent.

7           Why don't you be more clear, Mr. Pfingst, as to what

8    you want, and then I will decide what to do.

9           MR. PFINGST:  My recommendation is that the Court's

10   process for requests from the jury with respect to testimony

11   is that if they identify that they wish to rehear a portion

12   of the testimony of a witness, that the entirety of the

13   witness' testimony be reread by the court reporter, and a

14   transcript not be provided or prepared.

15          THE COURT:  All right.  I think I can handle that

16   consistent with the requests of all counsel.  So, let's bring

17   the jury in.

18          Just a minute, before they come in, though, I do tell

19   them that if they want something reread, it's going to take

20   some time for the court reporter to put her notes together,

21   and that they can assume that it will take as long to have

22   the testimony reread as it did to hear it in the first place.

23   So, in the case of Mr. Parker's testimony, I don't remember

24   how long he was on the stand --

25          MR. TEDMON:  Four and a half hours.

1    THE COURT:  It will take four and a half hours.

2    MR. PFINGST:  That's generally what deters them from

3  doing it a second time.

4    THE COURT:  Maybe it will deter them from doing it the

5  first time.

6    MR. PFINGST:  Maybe.  The Court may ask, if you want

7  it reread, send out another note, and so on.

8    THE COURT:  Yes, I'll do that.

9    (Jury present.)

10    THE COURT:  Good morning, ladies and gentlemen.  I

11  have your note here, which states, Can we review a printed

12  transcript of Don Parker's complete testimony.

13    It has been some time since you were sworn in the

14  case, but you may recall that right after you took the oath,

15  I made a few remarks about how the trial would proceed, and I

16  told you a little bit about your duties as jurors, and I told

17  you at that time that the reporter was taking notes, but that

18  there would be no written transcript of the testimony at

19  trial for you to consult.  And so I told you it was

20  important, therefore, that you listen to the testimony as it

21  is given.

22    So, the answer to your specific question is that there

23  is no transcript of the testimony.  If you need to have

24  testimony reread, you can ask the Court to have the court

25  reporter reread the testimony of whatever witness it is that

1   you want to have reread again.  But, we can't go through and

2   just pick out bits and pieces of a witness' testimony and

3   have the reporter read that, that just is logistically

4   impossible.  So, if you wanted testimony reread, we would

5   have to ask her to reread the entire testimony of that

6   witness.

7          Now, you should understand that if you make such a

8   request, we will have to take a little time to have the

9   reporter get her notes together in a form that she can read

10  them to you.  And further, you have to understand that it

11  will probably take about as long to have the testimony reread

12  as it did for you to hear it in the first place, which in the

13  case of Don Parker was about four and a half hours.

14         So, what I'm going to do is have you go back into the

15  jury room and deliberate.  If you can, rely upon your

16  collective memories of what was said; that's why there are 12

17  of you, and that's why we allow you to take notes.  Even

18  though you should not be overly influenced by them, they may

19  refresh your recollection as to what you recall the testimony

20  to have been.

21         If you do want testimony reread, come back and tell us

22  what you want reread, with the understanding that it's going

23  to take us a little while to put it together, and it will

24  take some time to reread it.

25         All right.  So, go back and resume your deliberations.

1          (Jury not present.)

2          THE COURT:  The jurors have returned to the jury room.

3          Is everybody in accord with the response I gave to the

4    question?

5          MS. PLETCHER:  Yes, Your Honor.

6          MR. PFINGST:  Yes, Your Honor.

7          MR. TEDMON:  Yes, Your Honor.

8          MR. BOCKMON:  Yes, Your Honor.

9          THE COURT:  All right.  So, remain available.  Now,

10   all defendants are ordered to remain in the building while

11   the jury is deliberating.

12          (Court in recess pending deliberations.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          SACRAMENTO, CALIFORNIA

2       THURSDAY, MARCH 6, 2014, 10:42 a.m.

3                  ---oOo---

4          THE COURT:  We have another note from the jury.  I

5   don't know whether they prepared this after they retired or

6   before.  It's a fairly long note.  Let me get my instructions

7   out here.  I don't have my instructions in order.

8          The question is:

9          Answer to question on Instruction 15:  Lines 25-27 on

10  page 2 of Instruction 15 say "...you must find that he

11  knowingly became a member of the conspiracy to eliminate,

12  reduce, or interfere with competition."  Does this mean that

13  the defendant's motive, and he underscores motive, was to

14  eliminate...competition; or, does it mean that the defendant

15  simply knowingly became part of the conspiracy?

16         I believe the answer to that question is that the

17  phrase "to eliminate, reduce, or interfere with competition"

18  modifies "conspiracy."

19         Maybe that's not a sufficient answer.  It doesn't mean

20  that the defendant had to have a motive to eliminate, reduce,

21  or interfere with competition.

22         MR. PFINGST:  He needs to share the intent to do that,

23  Your Honor.  It may not be -- motive may not be the correct

24  word of art for a jury, but he has to share the intent --

25         MS. PLETCHER:  That's general intent.

MR. PFINGST:  And that is the -- that is what the

instruction describes, is that you have -- the conspiracy has

an intent, and the members of the conspiracy who join must

share that intent.

MS. PLETCHER:  No, that's not correct.

THE COURT:  All right.  Look, I think the problem is

that I didn't design this instruction as well as I could

have.  He thinks -- I don't know what he thinks.

You know, you can see I get very frustrated when I try

to instruct the jury, when I tell them something, and they

come in with some idiotic interpretation of what I said.

They come in and they ask for a transcript when I told them

there is no transcript.  They come in and reconstruct an

instruction that I gave in such a way that I don't

understand.

So, why don't we do this, why don't we take -- I'll

take a short break, and you decide how you want me to

respond.  And if you can agree on how I should respond to

this question, tell me how I should respond.  If you can't

agree, I will just tell them the answer is in the

instructions.

MR. BOCKMON:  We're not going to agree.

MS. PLETCHER:  Your Honor --

MR. TEDMON:  The answer is in the instructions.

MR. BOCKMON:  I agree, the answer is in the

1   instructions.

2        MR. TEDMON:  That's exactly right.

3        MS. PLETCHER:  If you could just read it one more

4   time.

5        THE COURT:  The question?

6        MS. PLETCHER:  Yes, please.

7        THE COURT:  Let me give you -- I'll pass it down to

8   you, and you can all look at the question.

9        MR. PFINGST:  Yes, if we could have some time --

10        THE COURT:  Right.  Take some time.

11        Can I amend something I just said?  My law clerk who

12   helped me with these instructions wanted me to tell you that

13   the part that they're confused about is not something I

14   wrote, it's something you wrote, and agreed upon, and asked

15   me to put in the instructions.

16        MR. PFINGST:  I want to thank her for pointing that

17   out to us, Your Honor.  That's very kind of her to let us

18   know that.

19        (Thereupon a recess was taken.)

20        THE COURT:  All right.  You have discussed this.  Do

21   you have any suggestions?

22        MR. PFINGST:  May I -- just another minute or two?

23        THE COURT:  All right.  Let me just -- before you say

24   something, I wanted to point something out.

25        This sentence that they, apparently, are troubled with

1    begins with the phrase, "As I instructed you earlier."  So, I

2    would suggest that I simply remind them that the sentence

3    begins with the phrase "As I instructed you earlier," so they

4    are to go back and look at my other instructions, which I

5    believe will answer the question.

6            MR. PFINGST:  Which the Court is thinking about

7    instruction 13?

8            THE COURT:  I'm thinking about all the instructions.

9            MR. TEDMON:  All of them.

10           THE COURT:  I'm thinking about the instruction with

11   the elements.  I'm thinking about -- you see, that's one of

12   the points here, you should not unnecessarily highlight parts

13   of instructions, or particular instructions, because, as I

14   tell them, which they already may have forgotten, you're not

15   to single out some and ignore others, they're all important.

16   So, for me to say, go back and look at instruction number

17   this or number that, defeats that whole concept.

18           But, in answer to your question here, 14 has the

19   second element that the defendant knowingly became a member

20   of that conspiracy, knowing of at least one of its objects

21   and intending to help accomplish it.  So, if they go back and

22   they read that, along with all the other instructions, it

23   should answer their question.

24           MR. PFINGST:  I share the Court's frustration with the

25   note.  My anxiety is because of the word "simply" in the note

1    on the last sentence.  "Simply knowingly" there would seem to

2    indicate sort of a strict liability thought that the

3    conspiracy had its object --

4         THE COURT:  But I defined "knowingly" three, maybe

5    four times.  As a matter of fact, I was embarrassed as I was

6    reading the instructions because I kept repeating myself

7    whenever it came to the element of knowingly, and I read that

8    paragraph at least three times.  And it's not "simply

9    knowingly."  If it was "simply," I wouldn't have had to

10   define it in a paragraph of several sentences.

11        MS. PLETCHER:  Your Honor, we agree.  We found at

12   least three instructions that go to this question of

13   knowingly and willfully participating in the conspiracy; 13,

14   14 and 17.  So, directing the jury to go back and look at the

15   previous instruction, I think, is --

16        THE COURT:  Why don't you look at 18 while you're at

17   it, because it says this, "I previously explained an act is

18   done knowingly if," and there are eight more lines defining

19   what I mean by "knowingly."

20        MS. PLETCHER:  So, instructing them to go back and

21   look at the previous instructions is, we think --

22        THE COURT:  And then go back and look at number 20.

23   Look at the last paragraph of that.  Under the first element,

24   "An act is done knowingly if," and then there follows my

25   extensive discussion of what is meant by "knowingly."

MR. PFINGST: It would appear, Your Honor, that the jurors are questioning the difference between the word motive and the word knowingly, and is there a distinction between those two words. Because they correctly, in both -- point out the word "knowingly" in both parts of the letter -- the question, but are unable to distinguish between what knowingly is and what motive is, would seem to be the issue for whoever wrote the note. And --

THE COURT: I think if I were to embark upon a discussion about the difference between knowingly and motive, I would probably confuse them even more.

MR. PFINGST: I would agree that motive is not the issue, it's the intent. I would substitute the word intent for motive in the context they've put it in. Understanding the Court can't do this. The Court has the word motive in front of it. But I think, in layman's terms, jurors talking about an intent issue as opposed to a motive issue, and the difference between knowingly and intentionally.

And, so, if it was not the intent of the person joining a joint venture to suppress competition, then is that -- does that mean that there is no criminal culpability, as opposed to, as they say, simply knowingly became part of the conspiracy.

So, is there an intent requirement, and we would suggest there is an intent requirement to this. And the

1  intent has to be there because of the uniqueness of the joint

2  venture issues that overlap the per se requirements of the

3  Sherman Antitrust Act.

4      THE COURT:  If I were to repeat what you just said,

5  don't you agree that that would confuse the jury irreparably?

6      MR. PFINGST:  I'm trying to think of a simple way to

7  do it.  And I am sensitive to the Court's concern that

8  throwing another word in there is not likely, necessarily, to

9  illuminate this.  But, on the other hand, I hate answering

10  these tossups like Jeopardy, with the music playing in the

11  background, and getting ready for -- you don't answer it

12  quick enough --

13      THE COURT:  You know, that's right.  That is so true.

14  You can have a trial that goes 20 days long, and the whole

15  thing hinges on the response to a jury question where we're

16  under the gun.  And I have been reversed in the past because

17  of a response that I gave to a jury instruction under just

18  those circumstances.

19      MS. PLETCHER:  Your Honor, we've already discussed the

20  intent issues.  I believe Mr. Pfingst stated them

21  incorrectly.  It was an incorrect statement of the law.  But,

22  we've all agreed to what's in the jury instructions, they're

23  accurate, they're correct statements of the law.  Everything

24  this jury needs to know is in here.

25      THE COURT:  And I think if they go back and read the

1    instructions there, as a whole, it will answer their

2    question.  And I think that's how I'm going to answer this.

3           It's very simple for me, without demeaning their

4    question, to simply say, you will note that this sentence

5    that you have -- are addressing begins with the phrase, "As I

6    instructed you earlier."  I think if you go back and look at

7    the Court's other instructions, you will find the answer to

8    your question.

9           MR. PFINGST:  With respect -- respecting the thought

10   the Court has put into these instructions, and counsel put

11   into these instructions, just for simplicity's sake,

12   defendant Katakis' position will be the answer should be yes.

13   And understanding that the Court has -- but to preserve our

14   record, that the answer should be yes.

15          THE COURT:  The question can't be answered yes or no.

16          MR. PFINGST:  Does this mean the defendant's motive

17   was to eliminate, or does it mean -- oh.  It should be, yes,

18   it does mean the defendant's motive was to eliminate.

19          MR. TEDMON:  Now I'm confused.  I'm sorry, Paul.

20          MR. PFINGST:  So, I would say to the question, Does

21   this mean the defendant's motive was to eliminate...

22   competition?  The answer to that should be, yes --

23          THE COURT:  Did we discuss motive, the word motive, in

24   these instructions?

25          MS. PLETCHER:  No.  The word does not come up in these

1    instructions.

2         MR. PFINGST:  But these are not lawyers, so I'm not

3    going to hold them to hitting the correct mens rea on their

4    notes.

5         THE COURT:  You may have an exception for the record.

6    I am not going to instruct them as you have suggested.  For

7    one reason, because it interjects a new term into the Court's

8    instructions, which the jury has used, but I have not used

9    and have not defined.  And, secondly, I think the better

10   approach is the one that I'm going to give.

11        So, let's bring the jury in.

12        (Jury present.)

13        THE COURT:  The jurors are all present.  I have your

14   note here, which reads:

15        The jury requests the following:  Answer to question

16   on Instruction 15, lines 25-27 on page 2 of Instruction 15

17   say "...you must find that he knowingly became a member of

18   the conspiracy to eliminate, reduce, or interfere with

19   competition."  Does this mean that the defendant's motive was

20   to eliminate competition, or does it mean that the defendant

21   simply knowingly became part of the conspiracy?

22        I'm going to direct your attention to the first part

23   of the sentence that you've quoted from.  It begins with the

24   words, "Rather, as I instructed you earlier."  So, if you

25   will go back and look at the Court's other instructions,

1    including this instruction, I think you will find the answer

2    to your question.  I don't think I can answer it any other

3    way more directly.

4            So, go back and resume your deliberations.

5            (Jury not present.)

6            THE COURT:  At noon you can leave.  But, in the

7    meantime, stay within short range of the courtroom, we may

8    get another question.

9            MR. TEDMON:  Your Honor, just to clarify, it's noon to

10   1:30?

11           THE COURT:  That will be -- that's -- as far as you're

12   concerned, if they come back between noon and 1:30, I won't

13   expect you to be here.

14           MR. TEDMON:  Great.  Thank you.

15           (Court in recess pending deliberations.)

16

17

18

19

20

21

22

23

24

25

SACRAMENTO, CALIFORNIA

THURSDAY, MARCH 6, 2014, 4:28 p.m.

---oOo---

1

2

3

4          THE COURT:  Everybody is present except the jury.

5          It's almost 4:30.  I propose we bring them in and

6    excuse them, as we did, until 9:00 o'clock tomorrow morning.

7          All right.  Bring the jurors in.

8          (Jury present.)

9          THE COURT:  Jurors are all present.

10          Mr. Orlando, I know you've been hard at work.  Would

11    the jury like to adjourn for the day and come back at

12    9:00 o'clock tomorrow morning?

13          JUROR ORLANDO:  Yes, we would, Your Honor.

14          THE COURT:  All right.  Then I will permit you to do

15    that.  And I know you all showed up promptly at 9:00 o'clock

16    this morning.  So, if you'll do so tomorrow morning, you may

17    resume with your deliberations at that time.  Have a nice

18    evening.

19          JUROR ORLANDO:  Thank you.

20          (Jury not present.)

21          THE COURT:  All right.  Counsel, same understanding as

22    we had today.  We'll see you tomorrow.

23                (Proceedings adjourned, 4:30 p.m.)

24                        ---oOo---

25

1              SACRAMENTO, CALIFORNIA

2           FRIDAY, MARCH 7, 2014, 3:39 p.m.

3                    ---oOo---

4         THE COURT:  Defendants are present with counsel.

5    Government counsel is present as well.

6         We have a note from the jury which reads as follows:

7         The jury requests the following:  Jury members request

8    to listen to the audiotape evidence of Ted Longley.

9         I understand that you have the laptop here that will

10   play those audiotapes?

11        MS. HEYE:  Yes, Your Honor.

12        THE COURT:  The only question is whether we show the

13   jury the text that went along with it at the time.  And I got

14   the impression that there was no dispute as to the accuracy

15   of that text, so, unless somebody disagrees, I would suggest

16   we play it and let them look at the text at the same time.

17        MR. BOCKMON:  If they request that, Your Honor, but

18   they haven't requested that.

19        THE COURT:  Well, I know, but it shows up on the

20   screen when the government plays it.

21        MR. SCOBLE:  The government doesn't have to display

22   the screen, Your Honor.

23        MR. BOCKMON:  It's not in evidence.

24        THE COURT:  I know.  I know.  All right.

25        Can you play it without showing the screen?

1          MS. HEYE:  Yes, we can.

2          THE COURT:  All right.  Good.  So, let's bring the

3     jury in, then.

4          (Jury present.)

5          THE COURT:  The jurors are all present.

6          Mr. Orlando, I'm assuming this is your signature I see

7     at the bottom of these notes?

8          JUROR ORLANDO:  Yes, it is.

9          THE COURT:  I'm correct, then.

10         We have your note which states:  Jury members request

11    to listen to the audiotape evidence of Ted Longley.

12         We can do that, and I think the equipment is ready.

13    So, I'll ask that you --

14         MS. HEYE:  The laptop will take a few minutes to

15    start, but we will be ready shortly.

16         THE COURT:  You'll just be hearing the audio, now,

17    ladies and gentlemen, you won't be seeing the text.

18         (Audio played.)

19         THE COURT:  All right.  The jury has just heard both

20    of the tapes.

21         Mr. Orlando, is that what you wanted?

22         JUROR ORLANDO:  Yes, sir.

23         THE COURT:  All right.  You may resume your

24    deliberations.

25         (Jury not present.)

THE COURT: Stay around, counsel. If we haven't heard from them within the next half hour, I'll bring them back again and let them go for the weekend. But, you understand we're coming back Monday morning, 9:00 o'clock.

(Court in recess pending deliberations.)

1           SACRAMENTO, CALIFORNIA

2        FRIDAY, MARCH 7, 2014, 4:30 p.m.

3                  ---oOo---

4        THE COURT:  It's 4:30.  I didn't come back sooner

5   because sometimes when the jury asks to hear something they

6   need time to discuss it while it's still fresh in their mind.

7   But I'll bring them out now and let them go home for the

8   weekend, unless they want to stay longer.

9        (Jury present.)

10       THE COURT:  Jurors are all present.

11       I know you've been working hard today.  Mr. Orlando,

12  if the jury is in the middle of a discussion that you'd like

13  to complete, we'll let you deliberate longer.  But, if not,

14  if you'd rather go home for the evening and come back Monday

15  morning, we'll let you do that.

16       JUROR ORLANDO:  We are at a good break point.  Recess

17  is requested.

18       THE COURT:  Good.  All right.  Well, then, we will

19  excuse you for the weekend and have you come back Monday

20  morning and resume your deliberations at 9:00 o'clock.

21       This is the first time that we've had a weekend after

22  you started to deliberate.  So, you know, you've heard me say

23  it so many times, to remember the admonition and not forget

24  you're jurors.  It may be a little bit harder, now that

25  you've wound up and started to discuss this case, to turn it

1    off, but that's what you need to do.  I give you the same

2    advice that I did during the trial, and that is put it on the

3    back burner, you'll remember it when you come back.

4           And as soon as all of you are in the jury room Monday

5    morning at 9:00 o'clock, you may resume with your

6    deliberations.

7           Have a nice weekend.

8           (Jury not present.)

9           THE COURT:  All right.  Well, you have a nice weekend

10   too.  See you Monday.  I do have a calendar Monday morning,

11   so if the jury comes back with a question, I'll have to

12   interrupt my calendar.  Don't be surprised if you come in the

13   courtroom and there are other lawyers in here.

14                  (Proceedings adjourned, 4:33 p.m.)

15                         ---oOo---

16

17

18

19

20

21

22

23

24

25

1          SACRAMENTO, CALIFORNIA

2          MONDAY, MARCH 10, 2014, 4:11 p.m.

3                  ---oOo---

4          THE COURT:  Counsel are present with the defendants.

5          We have a note from the jury.  It was only -- this

6   time only five minutes ago, which is good.

7          It says, The jury requests the following:

8          The jury requests clarification to Instruction Number

9   19.  For the first part of the explanation as to when mail

10  fraud occurs; does the word scheme refer to a specific mail

11  fraud scheme, or does it refer to the conspiracy charged in

12  Count 1?

13         Now, if you brought your instructions, which I hope

14  you did, because last time you didn't bring your

15  instructions.  When you come into the court while the jury is

16  deliberating, the sensible thing to do is bring the

17  instructions with you.

18         Instruction Number 19 relates to mail fraud.

19  Instruction Number 19 begins with the words, Under Count 2,

20  which is the mail fraud count, the government is not required

21  to prove that a person actually committed mail fraud, but you

22  must understand what mail fraud is.  Mail fraud occurs when a

23  person has done all of the following:

24         First, the person knowingly participated in, devised,

25  or intended to devise a scheme or plan to defraud, or a

scheme or plan for obtaining money or property by means of

false or fraudulent pretenses, representations, or promises.

          And then the rest of the instruction goes on and

refers to the scheme, the scheme, the scheme.

          Now, I don't know what else I could have said.  It

does not refer to the conspiracy charged in Count 1.  My

inclination is to tell them to read the instruction along

with all the other instruction, but they've been deliberating

so long, and they've been so good otherwise, I don't know

what they're talking about in there, but if they don't

understand this instruction, they might as well give up.

          MS. HEYE:  Would you read the question one more time.

          THE COURT:  I'll pass it out and you can all look at

it.

          This instruction, as you'll recall, is the aiding and

abetting instruction.  Oh, it's not.

          MS. HEYE:  I think it's the elements of mail fraud.

          THE COURT:  No, you're right, it's not the aiding and

abetting instruction.

          MR. PFINGST:  It would seem -- just thinking out loud

for a second, Your Honor, it would seem that they're trying

to find out whether it has to be the conspiracy, or something

other than the conspiracy.

          THE COURT:  Right.  Here is the problem, and it's not

the aiding and abetting instruction, we haven't gotten there

1    yet, but the problem came about because the government didn't

2    charge mail fraud, they charged conspiracy to commit mail

3    fraud.  And in order to let the jury know what you had to

4    prove in order to prove a conspiracy to commit mail fraud,

5    they had to know what mail fraud was.  And so the previous

6    instruction gave them the elements that the government had to

7    prove in order to establish the mail fraud -- the conspiracy

8    to commit mail fraud, and then this one tells them what the

9    elements of a mail fraud are.

10          MR. PFINGST:  Yeah, I think, Your Honor, what they're

11   looking at is does this have to charge a separate scheme than

12   a conspiracy, or can it be the conspiracy.  It looks to me

13   that they may be discussing whether, because it's a separate

14   charge, it has to involve different conduct than what would

15   be contained in Count 1, or can it be the conduct that is

16   contained in Count 1, or does it have to be different conduct

17   than Count 1.

18          THE COURT:  I don't know.

19          MR. PFINGST:  That's what -- I mean, that's as close

20   as I can come to interpreting the intent of the note.

21          MS. HEYE:  I think it is clear that the mail fraud

22   does not need to refer to the conspiracy charged in Count 1.

23   But, I agree, it's difficult to know what the jury is

24   thinking.

25          THE COURT:  There are two separate conspiracies.  One

1    is the conspiracy charged in Count 1, and the other is the

2    conspiracy charged in Count 2.

3         MS. HEYE:  Right.

4         THE COURT:  This instruction has nothing to do with

5    the conspiracy charged in Count 1.  This instruction is

6    designed to tell them what a mail fraud violation is so that

7    they can determine whether the government has proved a

8    conspiracy to commit mail fraud.

9         MR. PFINGST:  Yes.

10        THE COURT:  Can I look at it again?

11        MR. PFINGST:  Yes.

12        THE COURT:  Right.  I just looked at it again, and I

13   think what I just said fairly summarizes the issue.

14        So, what do you want me to tell them?

15        MR. TEDMON:  Your Honor, from our perspective, I think

16   the instructions are fine as they are.  I don't think they

17   should be given any supplemental instructions.  It's clear

18   what it is between 18 and 19.  They have to read it, just

19   like last week.

20        MR. BOCKMON:  We join Mr. Tedmon.

21        THE COURT:  Mr. Pfingst?

22        MR. PFINGST:  I'm trying to think it through.

23        Another alternative -- again, thinking a little bit

24   out loud, is whether or not we can ask them to be a little

25   bit more specific in their note.

1      THE COURT:  I could tell them a lot of things, and in

2  my mind I wouldn't be doing anything wrong.  But the danger

3  of telling them anything is that it could later be criticized

4  as wrong.

5      For example, I could tell them what I just said

6  earlier, that Instruction Number 19 relates to Count 2, the

7  conspiracy to commit mail fraud charge, it does not relate to

8  Count 1.  And Instruction Number 19 is there to tell them

9  what a mail fraud is.

10      MR. PFINGST:  So, if I'm understanding the Court

11  correctly, that it's an instruction along the lines of

12  Count 2 is an independent account -- independent count, and

13  is not governed by Count 1.  We got into this discussion in

14  advance of this --

15      THE COURT:  Right.  But, you know, you or your

16  successor-in-interest could arguably criticize that, because

17  you're the one that said you wanted me to tell the jury they

18  couldn't find him guilty --

19      MR. PFINGST:  That's what I was going to say.

20      THE COURT:  -- on Count 2 unless they were guilty on

21  Count 1.

22      MR. PFINGST:  That's what I was going to point out to

23  the Court.  I had taken the position you can't have one

24  without the other.  Based on the evidence in the case, and

25  the proof in the case, there is no evidence to support a

1    separate fraud in this case other than the charged

2    conspiracy.

3           THE COURT:  But I did instruct on both counts

4    separately, and Instruction Number 19 was designed to

5    elucidate Instruction Number 18, and it relates to the mail

6    fraud charge, it does not relate to Count 1, because it

7    begins with the three words, "Under Count 2."

8           MS. HEYE:  Your Honor, I believe that what you just

9    said, that Instruction 19 relates to Count 2 and not Count 1,

10   and that it is meant to tell them what mail fraud is for the

11   purposes of Count 2, might help them focus, for lack of a

12   better word, a better question.

13          THE COURT:  I could tell them that.  But, again, the

14   risk is that you spend a lot of time crafting the

15   instructions, and then you're asked on the spur of the moment

16   to make some remarks that somebody is going to look at under

17   a microscope down in San Francisco, or in Pasadena, after

18   nine months of somebody scrutinizing it, and it may just not

19   be worth it.

20          What you said is pretty much what I thought.  But

21   Mr. Bockmon might not agree with it, Mr. Tedmon might not

22   agree with it, somebody later might not agree with it.

23          I could take the chance if I thought it really was

24   necessary to explain this to the jury.  But, I'm very

25   frustrated that they can't figure that out for themselves.

And if they can't figure that out for themselves, I don't

know what else is going on in the jury room that I might have

to clear up.  If they think this relates to Count 1, there

are more problems going on in the jury room than this.

        Well, if the defense is satisfied with it, I'll just

tell them I can't clarify this any further.

        MR. TEDMON:  That's my position.

        THE COURT:  I think Instruction Number 19 is clear,

and I can't make it any more clear.

        MR. PFINGST:  Mr. Katakis' concern is that the only

conduct that could support a mail fraud conviction would have

to be involved in the conspiracy to bid rig, and not in some

other type of behavior --

        THE COURT:  But the word "scheme" in here relates to

the mail fraud scheme, obviously.

        MR. PFINGST:  Yes, but --

        THE COURT:  That's the only context -- that is the

only context in which the word "scheme" is even used anywhere

in these instructions.  So, to think that the word "scheme"

applies to anything other than mail fraud demonstrates a

fundamental confusion.

        MR. PFINGST:  The only scheme that would support a

conviction for mail fraud in this case has to do with the

conspiracy, implementing the conspiracy.

        THE COURT:  No, but the only context that it's used

1    in -- in these instructions is a scheme or plan to defraud,

2    or a scheme or plan for obtaining money or property by means

3    of false or fraudulent pretenses, representations, and

4    promises.

5        Now, what I could tell them, again, with a concern

6    that somebody else may criticize this down the road, is that

7    the word scheme refers to a scheme or plan to defraud, or a

8    scheme or plan for obtaining money or property by means of

9    false or fraudulent pretenses, representations, or promises,

10   that is the context in which the word scheme is used.

11       Because the jury question here says, Does the word

12   scheme refer to a specific mail fraud scheme, or does it

13   refer to the conspiracy charged in Count 1?  And I could say,

14   The word scheme refers to a scheme or plan to defraud, or a

15   scheme or plan for obtaining money or property by means of

16   false or fraudulent pretenses, representations, or promises.

17       That sounds pretty good to me now, as I say it,

18   because I don't think anybody could criticize that.

19       MR. PFINGST:  You were on a roll there, I grant you

20   that.

21       THE COURT:  I don't think anybody could criticize

22   that.

23       MR. PFINGST:  On Count 1, a jury could -- if they've

24   decided Count 1, they can decide either, obviously, guilty or

25   not guilty.  In the event that they were to decide not guilty

1  on Count 1, we come back to the defendant's request in the

2  instruction that, therefore, there can't be a mail fraud in

3  Count 2.  And that's the position that I'm trying to preserve

4  and not surrender in an instruction.

5        THE COURT:  But the way I suggested earlier that you

6  preserve that is to wait and see what the jury does.  If they

7  find the defendant not guilty on Count 1 and guilty on

8  Count 2, then you are free to make your motion after the jury

9  verdict for a judgment notwithstanding the verdict.

10        MR. PFINGST:  Yes.  And, as the Court is aware, much

11  like the Court is put in a position with appellate courts,

12  defense counsel is put in a position for not preserving this

13  all the way down the line at every opportunity for

14  instruction, otherwise its waived.

15        THE COURT:  All right.  So, I'm saying you preserved

16  it.

17        And now, does anybody have any other objection to my

18  telling them that, The word scheme in Instruction Number 19

19  refers to a scheme or plan to defraud, or a scheme or plan

20  for obtaining money or property by means of false or

21  fraudulent pretenses, representations, or promises?

22        MS. HEYE:  No, Your Honor.  We believe that would be

23  helpful.

24        MR. TEDMON:  Your Honor, the only concern I have --

25  that's an accurate statement, but it's in the instruction.

1          THE COURT:  I know it.

2          MR. TEDMON:  And so -- my only concern is, there are

3     other parts of this instruction as well, talking about the

4     scheme, like the Court just mentioned.  So, my only concern

5     is if we focus --

6          THE COURT:  Your objection is preserved for the

7     record.  If this is error, if this is error, then I can't --

8          MR. PFINGST:  Repeating it can't be error.

9          THE COURT:  If it's error --

10         MR. PFINGST:  Repeating an instruction can't be error.

11         THE COURT:  Let's bring the jury -- yes, you know, it

12    can.  And I'll tell you why they say it can be error, because

13    it places undue emphasis on one part of the instructions.

14    You can never win.  That's why this is such a land mine part

15    of the trial.

16         MR. PFINGST:  Does the Court intend to release them

17    when they come back after --

18         THE COURT:  No.  I'm not going to now.  I'm going to

19    tell them to think about it a little bit more, talk about it

20    a little bit more, because if I tell them something, and they

21    go home, they're going to forget what I told them.  I'm going

22    to bring them back in, tell them to deliberate a little bit

23    longer, and I'll bring them back in in 15 minutes.

24         (Jury present.)

25         THE COURT:  Good afternoon, ladies and gentlemen.  We

1    haven't seen you for a while.

2         Mr. Orlando, I have your note here.  I've been

3    discussing it with the lawyers.  I'll read it for you.

4         The jury requests clarification to Instruction Number

5    19.  For the first part of the explanation, as to when mail

6    fraud occurs, does the word scheme refer to a specific mail

7    fraud scheme, or does it refer to the conspiracy charged in

8    Count 1?

9         I'm not sure of the context of your discussion in the

10   jury room, but I think the way to respond best to your

11   question is to point out to you that the word scheme in --

12   the word scheme in Instruction Number 19 refers to a scheme

13   or plan to defraud, or a scheme or plan for obtaining money

14   or property by means of false or fraudulent pretenses,

15   representations, or promises.  That's what the word scheme

16   means in Instruction Number 19.

17        Now, so that you have a chance to digest this, and

18   maybe talk about it just a little bit, rather than sending

19   you right home after I answer your question, I'm going to ask

20   that you go back in there, deliberate for about 15 more

21   minutes, and then I'll bring you out again and let you go for

22   the evening.  But I want to give you the chance to digest and

23   talk about the answer to your question.

24        JUROR ORLANDO:  Yes, Your Honor.

25        THE COURT:  All right.  Resume your deliberations.

KIMBERLY M. BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1          (Jury not present.)

2          THE COURT:  I'll be back in ten minutes.

3          (Court in recess pending deliberations.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    SACRAMENTO, CALIFORNIA

2              MONDAY, MARCH 10, 2014, 4:52 p.m.

3                         ---oOo---

4          (Jury present.)

5          THE COURT:  The jurors are all present.

6          Mr. Orlando, would the jury like to go home for the

7    day?

8          JUROR ORLANDO:  Yes, Your Honor.

9          THE COURT:  You may do so.  We will preserve your

10   books and papers in the jury room, as we have on the previous

11   dates.  And you come back tomorrow morning, resume your -- I

12   understand you were here early this morning, which we

13   appreciate.  Resume your deliberations as soon as all of the

14   jurors are present.  9:00 o'clock tomorrow morning.  Have a

15   nice evening.

16         (Jury not present.)

17         THE COURT:  All right.  We'll see you tomorrow.

18             (Proceedings adjourned, 4:53 p.m.)

19                       ---oOo---

20

21

22

23

24

25

1          SACRAMENTO, CALIFORNIA

2        TUESDAY, MARCH 11, 2014, 1:24 p.m.

3                ---oOo---

4        THE COURT:  We're meeting outside the presence of the

5   jury.  Defendants and counsel are present.

6        MR. SCOBLE:  Your Honor, Mr. Longley is not present.

7   He's on his way.

8        THE COURT:  Thank you for bringing that to my

9   attention.

10        THE CLERK:  There he is.

11        THE COURT:  Where was he?

12        MR. BOCKMON:  He thought he had until 1:30, Your

13   Honor.

14        (Pause in proceedings.)

15        THE COURT:  Now all of the defendants are present with

16   counsel.

17        Interestingly, this note is dated today's date at

18   11:30, it says, p.m.  I assume it means 11:30 a.m.  But the

19   clerk didn't get it, and I wasn't informed of it, until after

20   1:00.  So, I don't know what happens with these jury notes.

21   It is my desire to respond to jury questions as promptly as

22   possible, because I think that is something that we owe to

23   the jurors.  It's also a way to make sure that the trial and

24   the deliberations proceed efficiently.  I don't know what

25   happens between the time the jury writes a note and the time


SACRAMENTO, CALIFORNIA

TUESDAY, MARCH 11, 2014, 1:24 p.m.

---oOo---

1

2

3

4        THE COURT:  We're meeting outside the presence of the

5   jury.  Defendants and counsel are present.

6        MR. SCOBLE:  Your Honor, Mr. Longley is not present.

7   He's on his way.

8        THE COURT:  Thank you for bringing that to my

9   attention.

10        THE CLERK:  There he is.

11        THE COURT:  Where was he?

12        MR. BOCKMON:  He thought he had until 1:30, Your

13   Honor.

14        (Pause in proceedings.)

15        THE COURT:  Now all of the defendants are present with

16   counsel.

17        Interestingly, this note is dated today's date at

18   11:30, it says, p.m.  I assume it means 11:30 a.m.  But the

19   clerk didn't get it, and I wasn't informed of it, until after

20   1:00.  So, I don't know what happens with these jury notes.

21   It is my desire to respond to jury questions as promptly as

22   possible, because I think that is something that we owe to

23   the jurors.  It's also a way to make sure that the trial and

24   the deliberations proceed efficiently.  I don't know what

25   happens between the time the jury writes a note and the time

KIMBERLY M. BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1    I get it, but it is very frustrating.

2         Now, having said that, I think we have reached that

3    part of the trial where the defense strenuously asks me to

4    declare a mistrial and the government strenuously asks me to

5    instruct the jury to continue to deliberate, and each side

6    gives me the reasons for their position.

7         I would only say to you that the respective positions

8    of the government and the defense are usually based upon some

9    assumptions, one of those being that if the Court declares a

10   mistrial, the government will probably not try the case

11   again.  And the other is that if the Court instructs the jury

12   to continue deliberating, any verdict will probably be in

13   favor of the government.

14        Those assumptions may or may not be true in any

15   particular case.  And I did have one in San Francisco where

16   the jury announced that they were deadlocked as to one

17   lawyer's client, and he asked me to declare a hung jury.  I

18   didn't do that.  He got more and more strenuous in his

19   opposition, kept coming back, not only accusing me of making

20   error in allowing the jury to continue to deliberate, but

21   saying that everything that I told the jury was reversible

22   error, and any verdict would be tainted.  I hung in there,

23   and the jury finally returned a verdict of not guilty in

24   favor of his client.  I did have the satisfaction of being

25   able to hold off on ordering the clerk to record the verdict

1    until after the jury was gone, then I looked him in the eye

2    and said, You still want your mistrial?  Needless to say, he

3    changed his opinion.

4            So, let me ask --

5            MR. PFINGST:  Your Honor has not read us the note.

6            THE COURT:  That would be nice, if you heard the note.

7            MR. PFINGST:  I thought you were torturing us for some

8    premeditated enjoyment.  Now I know it was inadvertent, and

9    I'm comforted by that.

10           THE COURT:  Actually, you're right.

11           The note reads as follows:

12           The jurors request instructions on how to proceed as

13   we have been deadlocked on one of the counts for a full day.

14           So, I did need to read you the note, because it does

15   not say they're deadlocked on all counts, or as to all

16   defendants.  It says they are deadlocked on one of the

17   counts, and have been deadlocked for a full day, as of 11:30

18   a.m.

19           Now, you can think about it for a minute, and you can

20   draw whatever inferences you want to draw from the questions

21   that they've asked, from the way they've phrased this letter,

22   as to what their hang-up might be.  So, let me give you a

23   little chance to think about it.  Why don't you talk amongst

24   yourselves privately, just so that you're deliberate in

25   whatever you want me to do.

1          (Discussion held off the record.)

2          THE COURT:  Are you sending a text to Ms. Pletcher, or

3     what are you doing?

4          MS. HEYE:  No, Your Honor.  Sorry.

5          THE COURT:  I saw you looking down.  I didn't want to

6     interrupt you.

7          MS. HEYE:  I was putting notes on my notepad.

8     Ms. Pletcher is out of communication.  We are authorized to

9     act on her behalf.

10          THE COURT:  So, what would you like the Court to do?

11          MS. HEYE:  We would like the Court to ask the jury to

12     return the verdict as to the defendants and counts they are

13     agreed to under 31(b)(1) and 31(b)(2).  We would also ask the

14     Court to poll the jury to understand what this remaining

15     issue is; whether it's one count as it relates to multiple

16     defendants, or simply one defendant, to determine whether or

17     not a clarifying instruction or further deliberation might be

18     appropriate.

19          THE COURT:  There is some potential problems with what

20     you suggested.  But, before I comment on your suggestion, let

21     me see what the defense would like me to do.

22          MR. PFINGST:  Your Honor, we believe the Court should

23     take whatever verdicts the Court has, declare a mistrial with

24     respect to the remaining count.

25          THE COURT:  Here is the problem with what the

1    government has suggested.

2         If I make inquiry as to which count or which

3    defendants it is, that could require them to give me more

4    information than I should have or than you should have.

5    Furthermore, if I ask any further questions in an attempt to

6    see whether there is anything I can do to facilitate their

7    discussions, that would run an even further risk that we

8    would divulge something that they're not supposed to divulge

9    to the Court.

10        There is an Eighth Circuit case, and I asked one of my

11   law clerks to get it for me a little while back.  Actually,

12   the case that I'm about to mention came up in the discussion

13   that I had with the lawyer in San Francisco, and it was

14   actually he who brought it to my attention in the course of

15   that discussion.

16        Was it Rule 31(b) that you mentioned?

17        MS. HEYE:  Yes, Your Honor.  31(b)(1) and (2).

18        THE COURT:  Rule 31(b)(1) and (2) does provide that if

19   there are multiple defendants the jury may return a verdict

20   at any time in its deliberations as to any defendant about

21   whom it has agreed.  And, if the jury cannot agree on all

22   counts as to any defendant, the jury may return a verdict on

23   those counts on which it has agreed.

24        You would think, from that language, that what you're

25   suggesting would be a safe course.  But, the case I was

1    referring to was an Eighth Circuit case, United States versus

2    Benedict, that was cited to me some years ago.  The jury came

3    in, and conferred -- and the Court conferred with counsel

4    about the possibility of taking a partial verdict, and

5    defense counsel requested the Court instruct the jury to

6    continue deliberating.  The Court decided to take the final

7    verdicts on all three counts and to send the jury back to

8    continue deliberations on the remaining count.  If it had

9    been the other way around, and the government had requested

10   that, everything would have been copacetic, but it was the

11   defense that requested that the Court [sic] continue with the

12   deliberations, and then here is the language from the

13   opinion:

14         Recognizing that partial verdicts may be appropriate

15   in certain circumstances, we turn to the specific facts of

16   this case, reviewing the district court's decision for abuse

17   of discretion.  The danger inherent in taking a partial

18   verdict is the premature conversion of a tentative jury vote

19   into an irrevocable one.  It is improper for a trial court to

20   intrude on the jury's deliberative process in such a way as

21   to cut short its opportunity to fully consider the evidence.

22   Such an intrusion would deprive the defendant of the very

23   real benefit of reconsideration and change of mind or heart.

24         And then they do point out that the jury itself had

25   not reported a deadlock, and that neither party requested a

1    partial verdict.  So, there is a distinction there, but you

2    see that there is always a potential risk of taking a partial

3    verdict.

4         And then the Ninth Circuit case, which is not as

5    dramatic in its effect or language, is United States -- it's

6    not United States.  It was a habeas case from state court,

7    it's Harrison versus Gillespie, 640 F.3d 888, in which they

8    comment on the fact that continuing deliberations might well

9    have shaken the views on counts previously considered.

10        So, generally speaking, my preference, where I don't

11   agree to declare a mistrial, is not to have the verdicts

12   brought in and returned.  And I don't see that either

13   Rule 31(b) or any of these cases say that you can't do that,

14   or suggest that you shouldn't do that.  So, if I were to have

15   them continue to deliberate on the one count that they say

16   they have been deadlocked upon, my preference would probably

17   be not to take the verdicts on the other counts.

18        So, I can predict what you're going to say on both

19   sides here.  The defense is going to point out that the jury

20   has been deliberating since Thursday, and --

21             MR. PFINGST:  Wednesday.

22             THE COURT:  When?

23             MR. PFINGST:  Wednesday.

24             THE COURT:  Wednesday.  Wednesday afternoon, all day

25   Thursday, all day Friday, all day Monday, and half a day

1    today, and they have told us that they've been deadlocked on

2    one of the counts for a full day.  So, the defense is going

3    to say that's enough time.  The government is probably going

4    to say it's not enough time.

5         MS. HEYE:  Exactly, Your Honor.

6         THE COURT:  Why isn't it enough time?

7         MS. HEYE:  Given the length of the case, and the large

8    amount of evidence that they had to consider, and the

9    multiple counts, and multiple defendants, one day is not that

10   long of a time.

11        THE COURT:  But they don't say that they haven't been

12   able to consider all the evidence, they say they've been

13   deadlocked.

14        Let me ask the defense, what else would you say, other

15   than the fact that they've been deliberating for three or

16   four days?

17        MR. PFINGST:  The combination of that, with the fact

18   that they have arrived at verdicts on a substantial number of

19   counts at this point would give some credence to the fact

20   that they were able to distinguish between those verdicts

21   that they could reach and those verdicts -- or that verdict

22   that they could not reach.  So, by the fact that they have

23   accomplished a great deal, would give some credence to their

24   claim that they probably can't overcome the hump on this one

25   count.

1    THE COURT:  Anything either other counsel would like

2    to add to support the reasons for your request?

3        MR. TEDMON:  I think that's well stated.

4        MR. SCOBLE:  I would just add, Your Honor, that that

5    particular fact --

6        THE COURT REPORTER:  I'm sorry, I can't hear you.

7        MR. SCOBLE:  That particular factor, the jury's

8    estimation as to their own ability to reach a verdict, is the

9    one the Ninth Circuit considers the most important in

10   determining whether or not a mistrial should be declared.

11       THE COURT:  In that regard, I'm thinking about asking

12   Mr. Orlando, first, if he is satisfied that the jury has

13   deliberated fully, and that the views of all jurors who

14   wanted to be heard have been heard and considered by the

15   others, that no one feels that they have not been fully

16   heard, and that none of the jurors feel that any more

17   deliberations would be fruitful.

18       MR. PFINGST:  Can't go wrong with that.

19       MS. HEYE:  Your Honor, that would seem to slant the

20   answer to be yes.

21       THE COURT:  Well --

22       MS. HEYE:  Inquiring whether further deliberations

23   focused on this one count --

24       THE COURT:  What would I say that would -- see, now

25   you're starting to sound like that lawyer in San Francisco.

1    What would I say that wouldn't slant the answer, in your

2    view?

3          MS. HEYE:  Just thank them for their diligence and

4    hard work, and ask whether further deliberations, just

5    focused on this one count that they have been working

6    through, might assist -- might allow them to reach a verdict.

7          THE COURT:  How is that different from what I

8    suggested?

9          MS. HEYE:  Yours concluded all the ways that everybody

10   had already been heard, and had expressed all their views,

11   and they're ready to be done.

12         THE COURT:  Well, you know, I'll tell you something,

13   if there is any juror there that's being railroaded by the

14   others, and hasn't fully been heard, that's a good way to

15   find out.  I have actually gone through the panel and asked

16   each one of them if they're satisfied that they've been

17   heard, and they've been given an opportunity to express their

18   views to their fellow jurors, and if they've considered the

19   views of their fellow jurors.  I've done that.

20         But, if nobody has any objection to me at least asking

21   Mr. Orlando that question on the defense side, then I will do

22   that.  And if he says anything other than yes, I'll send them

23   back in and talk to you about it.

24         MR. PFINGST:  Assuming that he says that he's

25   satisfied that they've done all that they can do, would the

1    Court be of the mind to send them back in to fill out and

2    finalize the verdict form?

3           THE COURT:  That's what I would do.  I'd say, go back

4    in the jury room and fill out the verdict forms on the

5    defendants and the counts that you've been able to agree

6    upon?

7           All right?

8           MS. HEYE:  All right, Your Honor.

9           THE COURT:  I'm going to bring the jury in.

10          (Jury present.)

11          THE COURT:  The jurors are all present.

12          Mr. Orlando, I have your note.  It says 11:30.  Did

13   you send that note out at 11:30?  Because I didn't get it

14   until after lunch, and I would apologize if something held it

15   up.

16          JUROR ORLANDO:  My watch may be off.

17          THE COURT:  You may be still -- you started

18   deliberating on Standard Time.

19          JUROR ORLANDO:  That's what it was.

20          THE COURT:  And you don't know it's Daylight Savings

21   Time.  You've been locked up ever since we've been in

22   Daylight Savings Time.

23          JUROR ORLANDO:  That time is off.

24          THE COURT:  The note says:  The jurors request

25   instructions on how to proceed as we have been deadlocked on

1    one of the counts for one full day.

2           Now, Mr. Orlando, I want to ask you if you're

3    satisfied that each of the jurors has been allowed to express

4    his or her views fully.

5           JUROR ORLANDO:  Yes.

6           THE COURT:  And are you satisfied that each of the

7    jurors have listened to the views of their fellow jurors?

8           JUROR ORLANDO:  Yes.

9           THE COURT:  Do you believe that if you were instructed

10   to deliberate further that there is any reasonable chance

11   that you would be able to reach a unanimous verdict on the

12   count upon which you have been deadlocked?

13          JUROR ORLANDO:  No, I do not.

14          THE COURT:  Is there anybody in the jury that

15   disagrees with Mr. Orlando's answers to my questions here?

16          All right.  Well, I think you have been working hard.

17   What I'm going to ask you to do, Mr. Orlando, is return back

18   to the jury room and fill out the verdict forms on those

19   counts as to those defendants that you have been able to

20   reach a unanimous agreement upon, and then let the marshal

21   know and we'll bring you back into the courtroom.

22          JUROR ORLANDO:  Yes, Your Honor.

23          THE COURT:  All right.

24          (Jury not present.)

25          THE COURT:  When the jurors return to the courtroom, I

1 will, of course, inspect the verdict forms to assure that

2 they are in order. But, if they are in order, it will be the

3 Court's intention to have those verdicts recorded and to

4 declare a mistrial on the count upon which the jurors have

5 been unable to reach a verdict.

6 MS. HEYE: Yes, Your Honor.

7 THE COURT: You can sit down while we wait.

8 (Pause in proceedings.)

9 MS. HEYE: Your Honor, given there will likely be a

10 mistrial declared on at least one count, do you have a

11 practice in terms of speaking to the jury after they have --

12 the verdict has been read?

13 THE COURT: Let me wait until the defendants get back,

14 and then I'll answer your question.

15 MS. HEYE: Thank you, Your Honor.

16 (Pause in proceedings.)

17 THE COURT: Ms. Heye, you wanted to ask a question

18 while we're waiting for the jury?

19 MS. HEYE: I had two questions.

20 With respect to the notes from the jury, will those be

21 filed?

22 THE COURT: Yes.

23 MS. HEYE: My second question was, given it is likely

24 a mistrial will be declared on one count, I was asking if

25 Your Honor had a practice in terms of speaking to the jury so

1    we might evaluate --

2         THE COURT:  You're not going to be precluded from

3    speaking with the jury.  I will tell the jurors that they can

4    talk to whoever they wish about whatever they want, but they

5    don't have to talk to anybody.

6         MS. HEYE:  I'm sorry, Your Honor, with respect to the

7    mistrial count, do you want to set a status conference to

8    give us some time to decide what we want to do, or do you

9    want to handle that later?

10        THE COURT:  I will do that.  But let's wait until it

11   comes in first.

12        MS. HEYE:  Yes, Your Honor.

13        THE COURT:  You can wander around in the immediate

14   vicinity here.  There is no reason to stay in your seats.

15        (Pause in proceedings.)

16        THE COURT:  Defendants and counsel are all present.

17        The note from the jury reads:  The jury has reached a

18   unanimous verdict.  Hung on Count 2, two defendants.  So, we

19   will bring the jury in.  That's what, I think, we all

20   suspected.

21        (Jury present.)

22        THE COURT:  The jurors are all present.

23        I have your note.  Mr. Orlando, do you have the

24   verdicts?

25        JUROR ORLANDO:  Yes, I do, sir.

1          THE COURT:  Would you give them to the clerk.

2          The verdict forms appear to be in order, and your note

3   sent out most recently accurately reflects what is in the

4   verdicts.  It's as to Count 2 you were unable to reach a

5   verdict as to two of the defendants, but you were able to

6   reach a verdict as to one of the defendants on that count.

7          JUROR ORLANDO:  Correct.

8          THE COURT:  All right.  I'll ask that the clerk read

9   these verdicts and ascertain if they are the true verdicts of

10  this jury.

11         Read them in that order.

12         THE CLERK:  In the matter of Criminal Case 11-511, the

13  United States of America versus Andrew B. Katakis:

14         We, the jury, find the defendant, Andrew Katakis, as

15  follows:

16         Guilty of Count 1, a Conspiracy in violation of the

17  Sherman Antitrust Act, Title 15, United States Code,

18  Section 1.

19         And guilty of Count 3, Obstruction of Justice, in

20  violation of Title 18, United States Code, Section 1519.

21         Dated today's date, signed by the foreperson.

22         In the matter of Criminal Case 11-511, United States

23  of America versus Donald M. Parker:

24         We, the jury, find the defendant, Donald Parker, as

25  follows:

1          Guilty of Count 1, a Conspiracy in violation of the

2     Sherman Antitrust Act, Title 15, United States Code,

3     Section 1.

4          Signed today's date, by the foreperson.

5          In the matter of Criminal Case 11-511; the United

6     States of America versus W. Theodore Longley:

7          We, the jury, find the defendant, W. Theodore Longley,

8     as follows:

9          Not guilty of Count 1, a Conspiracy in violation of

10    the Sherman Antitrust Act, Title 15, United States Code,

11    Section 1.

12         And not guilty of Count 2, Conspiracy to Commit Mail

13    Fraud, in violation of Title 18, United States Code,

14    Section 1349.

15         Signed today's date, by the foreperson.

16         Ladies and gentlemen of the jury, are these your

17    verdicts as presented and read?  So say you one, so say you

18    all.

19         JUROR ORLANDO:  Yes.

20         THE COURT:  Does counsel for any party wish to have

21    the jury polled?

22         MR. PFINGST:  Yes, Your Honor.

23         THE COURT:  Would you please poll the jury.

24         THE CLERK:  Yes, Your Honor.

25         Juror Number 1, are these your verdicts as presented

1   and read?

2         JUROR ARCHIPLEY:  Yes.

3         THE CLERK:  Juror Number 2, are these your verdicts as

4   presented and read?

5         JUROR SOSA:  Yes.

6         THE COURT:  Juror Number 3, are these your verdicts as

7   presented and read?

8         JUROR ROSSI:  Yes.

9         THE CLERK:  Juror Number 4, are these your verdicts as

10   presented and read?

11         JUROR DOKKEN:  Yes.

12         THE CLERK:  Juror Number 5, are these your verdicts as

13   presented and read?

14         JUROR ROWE:  Yes.

15         THE CLERK:  Juror Number 6, are these your verdicts as

16   present and read?

17         JUROR HADDOX:  Yes.

18         THE CLERK:  Juror Number 7, are these your verdicts as

19   presented and read?

20         JUROR SILVA:  Yes.

21         THE CLERK:  Juror Number 8, are these your verdicts as

22   presented and read?

23         JUROR ORLANDO:  Yes.

24         THE CLERK:  Juror Number 9, are these your verdicts as

25   presented and read?

1          JUROR BATESON:  Yes.

2          THE CLERK:  Juror Number 10, are these your verdicts

3     as presented and read?

4          JUROR LUCKEY:  Yes.

5          THE CLERK:  Juror Number 11, are these your verdicts

6     as presented and read?

7          JUROR MASSEY:  Yes, ma'am.

8          THE CLERK:  Juror number 12, are these your verdicts

9     as presented and read?

10         JUROR GEISLER:  Yes.

11         THE CLERK:  Thank you.

12         THE COURT:  So they all say.  The verdicts, as read,

13    shall stand recorded.

14         Ladies and gentlemen, this concludes your service as

15    jurors in this case.  On behalf of the Court, and on behalf

16    of the attorneys and the parties, I want to thank you very

17    much for the attention that you have given to this case.

18    This has not been an easy case.  It has been lengthy.  The

19    issues were complex.  And you have been here every day, on

20    time, you have concentrated, focused, given us your

21    attention, you've done everything that we could ask.

22         You're no longer required to heed the Court's

23    admonition.  I'm sure you're tired of hearing me remind you

24    of it.  You may speak to whomever you wish about whatever you

25    wish.  You can look at whatever you want to look at, read

1    whatever you want to read.  But you don't have to talk to

2    anybody about the case unless you want to.

3         I have seen and participated in more jury trials than

4    I can count, but one part of the trial process that I have

5    never seen or participated in is the jury deliberations.  It

6    is a very important part of the trial, needless to say.  I'm

7    only sorry that our alternates weren't able to participate in

8    that part of the trial, because they were as diligent as you

9    have been in listening to the case.

10         I'm not going to take a lot of your time with any

11    further remarks, because I think the parties want to get on

12    to these proceedings.  So, again, thank you very much.  And

13    the clerk will pick up your keycards on the way out.  You can

14    keep your books as souvenirs, if you wish.  You have done a

15    very, valuable service as jurors in this case.  You're

16    excused.

17         MR. BOCKMON:  Your Honor, Mr. Longley is excused?

18         THE COURT:  Yes.

19         MR. BOCKMON:  Thank you.

20         THE COURT:  Has he posted bail?

21         MR. BOCKMON:  Your Honor, I'm not remembering the

22    terms of it at this time.  I ask it be exonerated.

23         THE COURT:  Any bail that Mr. Longley may have posted

24    in this matter is exonerated, and Mr. Longley is excused.

25         MR. BOCKMON:  Thank you, Your Honor.

1        THE COURT:  Now, as to Mr. Katakis and Mr. Parker,

2   each of these matters will be referred to the probation

3   officer for presentence evaluation and report.  The matter

4   will be continued to June the 9th, 2014, at 9:30 a.m. in this

5   court.

6        Mr. Katakis, you're ordered to be back here in this

7   court at 9:30 a.m. on June the 9th.  A report is going to be

8   prepared by the probation officer in order to assist the

9   Court in determining the sentence in your case.  You're going

10  to be asked to give information to the probation officer in

11  connection with that report.  If you wish to have Mr. Pfingst

12  present with you when you talk to the probation officer, you

13  may have him present.

14       And Mr. Parker, you're also ordered to be back here in

15  this court at 9:30 a.m. on June the 9th for judgement and

16  sentence.  You will also be asked to give information to the

17  probation officer in connection with your report.  And if you

18  wish to have Mr. Tedmon present with you when you talk to the

19  probation officer, you may have him present.

20       As to the remaining count against these two defendants

21  which the jury was unable to agree upon, the Court declares a

22  mistrial, and we'll discuss that count at a status conference

23  to be held on June the 9th at 9:30 a.m.

24       MR. PFINGST:  June the 9th is the status day, Your

25  Honor?

1          THE COURT:  That's the status day.  It's also the date

2   for judgement and sentence.

3          MR. PFINGST:  Okay.

4          THE COURT:  So, you don't have to come back twice.

5          MR. PFINGST:  I understand.  I just wanted to make

6   sure.

7          May I have an opportunity to view the verdict forms?

8          THE COURT:  Yes.  But the clerk is going to hold on to

9   them.  So, you can look at them up here.

10          MR. PFINGST:  That's all I need.

11          THE COURT:  Is there anything else?

12          MS. HEYE:  No, Your Honor.  Thank you very much.

13          MR. PFINGST:  No, Your Honor.

14          MR. TEDMON:  No, Your Honor.

15              (Proceedings adjourned, 2:20 p.m.)

16                  ---oOo---

17

18

19

20

21

22

23

24

25

1                      REPORTER'S CERTIFICATE

2

3                            ---oOo---

4   STATE OF CALIFORNIA      )
    COUNTY OF SACRAMENTO      )
5

6       I, KIMBERLY M. BENNETT, certify that I was the Official

7   Court Reporter, and that I reported verbatim in shorthand

8   writing the foregoing proceedings; that I thereafter caused

9   my shorthand writing to be reduced to typewriting, and the

10  foregoing pages constitute a complete, true, and correct

11  record of said proceedings:

12          COURT:   U.S. District Court
                     Eastern District of California
13
            JUDGE:   Honorable WILLIAM B. SHUBB, Judge
14
            CASE:    UNITED STATES OF AMERICA vs. ANDREW B.
15                   KATAKIS, DONALD L. PARKER, W. THEODORE
                     LONGLEY
16
            DATE:    MARCH 5-7 & 10-11, 2014
17
        IN WITNESS WHEREOF, I have subscribed this certificate at
18  Sacramento, California.

19                          /s/ Kimberly M. Bennett
                            KIMBERLY M. BENNETT
20                          CSR No. 8953, RPR, CRR, RMR

21

22

23

24

25